Carlos **MADRIGAL**, et al., Plaintiffs,

v.

**ALLSTATE INSURANCE COMPANY, et al., Defendants.**

Case No. CV 14–4242 SS

United States District Court, C.D. California.

Signed 05/19/2016

Arash Homampour, Farzad Yassini, Homampour Law Firm PLC, Sherman Oaks, CA, Warren Jay Binder, Binder & Associates, Pasadena, CA, for Plaintiffs.

Theona Zhordania, Sheppard Mullin Richter and Hampton LLP, Los Angeles, CA, Peter H. Klee, Sheppard Mullin Richter and Hampton LLP, San Diego, CA, for Defendants.

## ORDER DENYING DEFENDANT ALLSTATE INDEMNITY COMPANY'S MOTION FOR JUDGMENT AS A MATTER OF LAW (Dkt. No. 281) AND MOTION FOR NEW TRIAL (Dkt. No. 282)

SUZANNE H. SEGAL, UNITED STATES MAGISTRATE JUDGE

## I.

### INTRODUCTION

On April 21, 2014, Plaintiffs Carlos Madrigal ("Madrigal"), Richard Tang and Anna Tang (the "Tangs") (collectively, "Plaintiffs") filed suit in state court against Defendant Allstate Indemnity Company ("Allstate")[1] alleging claims arising from Allstate's failure to accept a settlement demand. Allstate removed the action to federal court on June 2, 2014 on the basis of diversity jurisdiction. On September 30, 2015, the Court granted Allstate's Motion for Summary Judgment in part, dismissing all of Plaintiffs' claims except: (1) Madrigal and the Tangs' respective claims for breach of the implied covenant of good faith and fair dealing; (2) the Tangs' claims for intentional and negligent misrepresentation;[2] and (3) the Tangs' prayer for punitive damages. (Dkt. No. 145 at 59–60).

---

1. The Parties stipulated to the dismissal of Allstate Insurance Company and to the substitution of Allstate Indemnity Company in its stead. (See Dkt. No. 162). For ease of reference, the Court will construe references in the record to "Allstate Insurance Company" to mean "Allstate Indemnity Company."

2. Pursuant to Federal Rule of Civil Procedure 15(b), on November 13, 2015, the Parties stipulated on the record that the Tangs' intentional misrepresentation claim would be deemed a claim for promissory fraud.

The Court held several pretrial hearings. The Court denied all of Plaintiff's motions in limine, but granted three of Allstate's motions in limine. (Dkt. 167, 176). Regarding jury instructions, the Court rejected several of Plaintiff's proposed instructions, but adopted the majority of Allstate's proposed jury instructions, including the more recent versions of the CACI instructions proposed by Allstate. However, the Court also modified or declined to include certain instructions over Allstate's objection, as discussed more fully below. (Dkt. Nos. 171, 184, 205, 207, 208). A jury trial commenced on November 12, 2015.

On November 20, 2015, at the close of Plaintiffs' evidence, Allstate orally moved for Judgment as a Matter of Law under Rule 50(a) on Plaintiffs' respective bad faith claims, the Tangs' promissory fraud and negligent misrepresentation claims, and the Tangs' prayer for punitive damages.

The Court granted Allstate's Rule 50(a) motion as to the negligent misrepresentation claim. (Dkt. 207). The Court took the remainder of the Rule 50(a) motion under submission. (Dkt. No. 209). On November 23, 2015, before the Parties began closing arguments, the Court denied the remainder of Allstate's Rule 50(a) motion.[3]

On November 24, 2015, the jury found Allstate liable on Madrigal and the Tangs' respective bad faith claims. (Dkt. No. 262 at 2). The jury awarded Madrigal the amount of the underlying excess judgment (a number stipulated to by the Parties), plus interest and costs "to be determined by the Court." (Id.). The jury awarded

Anna Tang and Richard Tang $50,000.00 each for the emotional distress caused by Allstate's breach of the implied covenant. (Id.). However, the jury also found that Allstate was not liable on the Tangs' promissory fraud claim and that the Tangs were not entitled to punitive damages. (Id. at 3–4).

On December 21, 2015, Allstate filed a Motion for Judgment as a Matter of Law under Rule 50(b) on Plaintiffs' bad faith claims, ("JMOL Motion," Dkt. No. 281), including the declaration of Peter H. Klee. ("Klee JMOL Decl.," Dkt. No. 281–1). Plaintiffs filed an Opposition on January 12, 2016, ("JMOL Opp.," Dkt. No. 285), including the declaration of Arash Homampour. ("Homampour Decl.," Dkt. No. 285–1). On January 26, 2016, Allstate filed a Reply, ("JMOL Reply," Dkt. No. 288), including a second declaration of Peter H. Klee. ("Klee JMOL Decl. II," Dkt. No. 288–1).

Also on December 21, 2015, Allstate filed a Motion for a New Trial, ("New Tr. Motion," Dkt. No. 282), including the declaration of Peter H. Klee. ("Klee New Tr. Decl.," Dkt. No. 282–1). On January 12, 2016, Plaintiffs filed an Opposition, ("New Tr. Opp.," Dkt. No. 286), including the declaration of Arash Homampour. ("Homampour Decl.," Dkt. No. 285–1).[4] On January 26, 2016, Allstate filed a Reply. ("New Tr. Reply," Dkt. No. 287).

On February 8 and on May 6, 2016 the Court held hearings on Allstate's Motions. For the reasons stated below, Allstate's Motion for Judgment as a Matter of Law is DENIED. Allstate's Motion for New Trial is also DENIED.

---

**3.** On December 7, 2015, the Court issued an Order further explaining the basis for the Court's denial under Rule 50(a). (Dkt. No. 268).

**4.** Plaintiffs filed the same declaration of Arash Homampour in opposition to both the Motion for Judgment as a Matter of Law under Rule 50(b) and the Motion for New Trial. Accordingly, the Court will cite to the declaration without qualifier as to the motion.

## II.

### SUMMARY OF EVIDENCE

On July 13, 2009, Richard Tang had a motor vehicle accident with Carlos Madrigal, which rendered Madrigal paraplegic.[5] (Trial Transcript ("Tr.") 11/12/15 PM at 28 (Stipulated Fact No. 2)). At the time of the accident, Mr. Tang and his wife Anna Tang were insured by Allstate with a bodily injury coverage limit of $100,000 per claimant. (Id. (Stipulated Fact No. 1); Tang, Tr. 11/20/15 PM at 40:5–12).[6] Madrigal was uninsured. (Varela, Tr. 11/16/15 at 140:11–3).[7] Madrigal pursued a claim against Mr. Tang for his injuries. (Tr. 11/12/15 PM at 28 (Stipulated Fact No. 5)).

Allstate first learned of Madrigal's claim in July 2009, through Mr. Tang's attorneys, Dobbin Lo and Associates ("Dobbin Lo"). (Varela, Tr. 11/16/15 at 98:5–9). On July 27, 2009, Madrigal's attorney Kyle Madison wrote to Allstate to state that he was representing Madrigal, and to learn the policy limits. (Madison, Tr. 11/17/15 PM at 56:2–8; see also Tr. Exh. 210). Allstate assigned adjuster Teresa Varela to Madrigal's claim on July 30, 2009. (Tr. 11/12/15 PM at 28 (Stipulated Fact No. 3); Varela, Tr. 11/16/15 at 97:20–21).

On August 4, 2009, Varela wrote to Madison asking him to provide Allstate with information about Madrigal's claim and to have Madrigal sign the enclosed medical and wage authorization forms. (Id. at 99:14–17 & 100:7–11). Varela's August 4, 2009 letter identified "RICHARD TANG"

as Allstate's insured, (Tr. Exh. 214), as did follow up letters from Allstate dated August 21, 2009 and September 24, 2009. (Tr. Exhs. 217 & 121). Madison never provided the requested medical and wage authorizations. (Varela, Tr. 11/16/15 at 101:5–15; Madison, Tr. 11/17/15 PM at 59:3–5 & 11/18/15 AM at 106:6–9).

Varela testified that her initial contacts with the Tangs were through Dobbin Lo. (Varela, Tr. 11/16/15 at 107:22–108:5). On August 21, 2009, Varela wrote to Dobbin Lo asking for authorization to obtain a recorded statement from Mr. Tang, which was granted. (Id. at 109:4–110:3; see also Tr. Exh. 217). The statement was made through an interpreter in the presence of Dobbin Lo on August 26, 2009. (Varela, Tr. 11/13/15 PM at 67:21–23 & 11/16/15 at 110:4–10). According to Varela, Mr. Tang stated that he made a right turn from the lane next to the curb and was not at fault. (Id. at 110:14–111:2). Mr. Tang told Varela that at the time of the accident, he was on his way to his wife's restaurant, where he worked, to pick up a list of food items to purchase for the restaurant. (Id. at 111:7–12).

Varela testified that after hearing Mr. Tang's version of the accident, she was concerned that Mrs. Tang could potentially be held liable because she was the registered owner of the vehicle that Mr. Tang was driving and because at the time of the accident, Mr. Tang was possibly acting within the "course and scope" of his em-

---

5. This summary does not purport to be a comprehensive review of all of the evidence presented at trial. Instead, it focuses on the evidence relevant to the Parties' arguments regarding Allstate's JMOL and New Trial Motions.

6. Citations to trial testimony will identify the witness. Unless otherwise specified, citations to "Tang" refer to the testimony of Anna Tang.

7. Unlike the transcripts for the other days of trial, the transcript of the November 16, 2015 proceedings includes both the morning and afternoon sessions in a single document. Accordingly, citations to the November 16, 2015 transcript will not distinguish between "AM" and "PM" sessions. (See Dkt. No. 271).

ployment. (Id. at 111:9–112:11). On August 28, 2009, Varela asked Dobbin Lo if the Tangs would allow her to disclose their policy limits to Madrigal's attorney, which they authorized on September 2, 2009. (Id. at 137:5–9; see also Tr. Exh. 220). At the end of September 2009, Varela obtained permission from Dobbin Lo to speak with the Tangs directly. (Varela, Tr. 11/17/15 PM at 31:19–23).

Varela and Madison first spoke on September 2, 2009. (Varela, Tr. 11/16/15 at 139:21–140:4). During the telephone call, Madison told Varela that he would gather Madrigal's medical bills and records and send them to her instead of providing a medical documents authorization. (Id. at 140:5–10). Madison told her that Madrigal was uninsured, which Varela memorialized in a notation in the case file stating "PER KYLE [MADISON] AT ATTY OFFICE (09/02/09 FILE NOTE BY ADJ–RTV), NO INSURANCE ... PROP 213."[8] (Id. at 140:11–3 & 141:14–17; see also Tr. Exh. 11 (ellipses in original)).

On September 24, 2009, Allstate received a copy of a medical bill from Madison reflecting medical expenses related to the treatment of his paraplegic condition of $34,398. (Varela, Tr. 11/16/15 at 151:16–22, 152:3–8 & 155:3–6; see also Tr. Exh. 234). On the same date, Varela wrote to Madison asking for the names of two witnesses who Madison claimed had seen the accident. (Varela, Tr. 11/16/15 at 150:8–14; see also Tr. Exh. 121). Varela states that Madison did not disclose those names in response to the letter. (Varela, Tr. 11/16/15 at 151:12–15). On September 28, 2009, Varela wrote to Madison again asking for additional medical records. (Id. at 153:7–

15; see also Tr. Exh. 236). On September 29, 2009, Madison sent Varela thirty-five pages of medical records that covered the first few weeks of Madrigal's initial hospital stay after the accident. (Varela, Tr. 11/16/15 at 155:12–24 & 157:3–10; see also Tr. Exh. 34). Varela testified that without a medical authorization from Madrigal, beyond the single bill and the thirty-five pages of medical records that Madison had voluntarily provided, there was no other medical information that Allstate could obtain. (Varela, Tr. 11/16/15 at 163:7–17).

In November 2009, Varela wrote to Madison asking him again to send the witness information that she had previously requested and any other information that he might have to help her further investigate liability. (Varela, Tr. 11/16/15 at 164:22–165:8; see also Tr. Exh. 148). Varela sent Madison another letter requesting the same information on December 11, 2009. (Varela, Tr. 11/16/15 at 165:21–166:8; see also Tr. Exh. 149). By the end of 2009, Varela claims that Madison had still not provided her with the witness information or any additional medical records. (Varela, Tr. 11/16/15 at 166:5–23). On January 15, 2010, Varela wrote Madison another letter requesting that information. (Id. at 167:13–168:13; see also Tr. Exh. 247).

Although Varela testified that Madison did not provide her with the names of any witnesses before January 15, 2010, (Varela, Tr. 11/16/15 at 166:5–23), Madison testified that he has a "memory" that "sometime" "after October of 2009" and before January 15, 2010, he provided Varela with the names of two witnesses to the accident. (Madison, Tr. 11/17/15 PM at 69:11–20).

---

8. Proposition 213, codified at California Civil Code Sections 3333.3 and 3333.4, provides in relevant part that "a person shall not recover non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damages if .... [t]he injured person was the owner of a vehicle involved in the accident and the vehicle was not insured as required by the financial responsibility laws of this state." Cal. Civ. Code § 3333.4(a)(2).

Madison lacks a contemporaneous record of providing that information, however. (Id.).

According to Varela, sometime between 4:30 and 4:45 p.m. on Friday, January 15, 2010, Allstate received via fax a demand letter from Madison, which she reviewed in the "early evening." (Varela, Tr. 11/16/15 at 169:20–170:1; see also Tr. Exh. 251). Although the demand letter indicated that medical records were enclosed, Varela testified that none were included with the fax or the hard copy of the letter she received a few days later. (Varela, Tr. 11/16/15 at 170:2–18). Madrigal's settlement demand letter stated in relevant part:

> This letter will confirm that Plaintiffs [sic] have made a policy limits demand to Defendant RICHARD TANG and his insurance carrier, Allstate Insurance Company, by way of a C.C.P. § 998 offer for $100,000.00....
>
> Before this letter's conditional policy limits settlement offer can be accepted by you on behalf of your insured, you must comply completely, not just substantially, with the following conditions precedent, and those conditions precedent must be completely performed by you within and only within 30 days from the date of this letter.
>
> 1. You must timely deliver to my office legible photocopies of all available liability insurance policies maintained by your insured;
>
> 2. You must timely deliver to my office the **appropriate release** of all claims forms;
>
> 3. You must timely deliver to my office a declaration under penalty of perjury, signed by your insured, specifically stating that no other liability insurance policies exist for the subject accident, (including an umbrella policy) [,] that he was not in the course and scope of employment, **and an asset sheet of all assets or lack thereof;**
>
> 4. You must deliver to my office a settlement draft, equal to the total amount of all available liability insurance policy limits along with a certified copy of the policy revealing limits;
>
> 5. ... **[I]f you do not understand any portion of this letter or if you believe that any portion of this letter cannot be complied with for any reason, then this instant conditional policy limits settlement offers [sic] requires you, as another condition precedent to be performed by you, at or within thirty (30) days from the date of this letter, to communicate in writing to my office, whatever, [sic] "problems" you deem to exist.** If your written problems establish good cause, then my office will grant you an extension of time within which you may accept my client's conditional policy limits settlement offer;
>
> ...
>
> **Time is of the essence. Therefore, failure on your part to completely perform all of the above conditions precedent at or within thirty (30) days from the date of this letter will be deemed to be a rejection of this letter's conditional policy limits settlement offer.** In other words, performance on your part of some, but not all, of the above condition [sic] precedent will be deemed by this instant letter to be a counter offer. You are hereby put on notice that any counter offers by you will hereby be rejected by this office....

(Tr. Exh. 251) (emphasis added). The settlement demand letter included contact information for four witnesses whose testimony the letter claimed established that Allstate's "insured [was] 100% liable for this accident." (Id.).

According to Madison, the use of the phrase "appropriate release" in the settle-

ment demand was "standard" language designed to encompass any insureds of whom the claimant might be unaware. (Madison, 11/18/15 PM at 30:12–17; see also Walker, Tr. 11/19/15 AM at 53:20–54:7). Furthermore, Madison testified that the "condition" in the letter inviting Allstate to inform him, in writing, of any "problem" in complying with the demand, was "sort of a catch-all so that if there is an issue that [he did not] know about, that they can raise it with [him]" and receive more time to resolve the perceived problem. (Madison, 11/18/15 PM at 109:20–22; Walker, Tr. 11/19/15 AM at 58:12–59:9). Madison stated that Allstate did not alert him to any such problem before rejecting Madrigal's offer. (Madison, Tr. 11/17/15 PM at 98:6–8 & 109:15–18). Madison further testified that certain reasons put forward by Varela during trial to explain why Allstate allegedly could not accept the offer, such as the purported requirement that a check be tendered before the release, the need for the release to include Mrs. Tang, and the submission of an asset sheet from Mrs. Tang, were in fact not "problems" preventing settlement of Madrigal's claim against the Tangs. (Id. at 109:23–110: 15).

Varela contacted the Tangs that night (January 15, 2010) between 7:30 and 7:45 p.m. to discuss the letter. (Varela, Tr. 11/16/15 at 171:7–10). Both Mr. and Mrs. Tang participated in the call. (Id. at 171:18–20). Mrs. Tang testified that based on her memory, this was her first conversation with Allstate.[9] (Tang, Tr. 11/20/15 PM at 42:12–15). Mrs. Tang translated for Mr. Tang during the call. (Varela, Tr. 11/16/15 at 171:23–172:5). Varela testified that she went through the demand letter's terms one by one and explained that the potential value of the case could exceed the policy limits. (Id. at 172:6–16). Varela also testified that she explained to the Tangs that the demand letter required declarations or documents regarding three issues: whether Mr. Tang was acting in the scope of his employment; the availability of other insurance; and an accounting of assets. (Id. at 172:17–173:1).

Even though the demand letter mentioned only Mr. Tang by name, Varela believed that compliance with the demand letter would require Mrs. Tang to reveal her assets along with Mr. Tang's because Mr. and Mrs. Tang were married and likely had community property. (Id. at 176:16–177:3). Also, because of Mrs. Tang's potential liability as Mr. Tang's employer and owner of the vehicle Mr. Tang was driving, Varela concluded that Allstate could not agree to a settlement unless it also specifically released Mrs. Tang. (Id. at 173:24–174:3). Varela testified that she told the Tangs that any settlement release had to include both Mr. and Mrs. Tang. (Id. at 173:24–174:3). However, there is no evidence that Varela specifically asked for Anna Tang's permission to reveal her identity to Madison.

According to Mrs. Tang, during the call Varela simply stated that Allstate was going to pay the policy limits demand so that both of the Tangs would be protected, and did not identify or explain any problems with the demand. (Tang, Tr. 11/20/15 PM at 47:7–15, 80:11–20 & 81:14–19). Mrs. Tang specifically claimed that Varela did not go through the letter and all of its conditions point by point, either orally during the call, or later in writing. (Id. at 45:16–23). Mrs. Tang further testified that Varela never told her that to settle the case, Allstate needed the release to include both her and her husband, or that the

9. Mrs. Tang also testified that she had spoken with Varela "weeks or months" after the accident about her restaurant insurance and her

potential liability. (Tang, Tr. 11/20/15 PM at 43:4–24).

requirement that Mr. Tang provide an asset sheet, which Mrs. Tang admitted Varela mentioned, encompassed Mrs. Tang's assets as well. (Id. at 61:9–11, 89:4–7 & 114:3–6). Mrs. Tang denied that she ever refused to disclose asset information, either during the January 15, 2010 call or afterwards. (Id. at 48:9–19).

Contrary to Mrs. Tangs' testimony, Varela stated that upon learning of the asset disclosure requirement, the Tangs immediately said that they did not want to provide an asset sheet. (Varela, Tr. 11/16/15 at 173:5–8). Varela told them to discuss the asset disclosure requirement with their attorney, and asked them to follow up with their commercial carrier to see if there was any additional commercial coverage. (Id. at 173:8–18; id. at 173:4–20). Varela claimed that Mrs. Tang agreed to "try and contact someone to discuss whether they should disclose [asset] information after all." (Id. at 177:10–18).

Varela explained why she did not insist that the Tangs disclose their assets:

Q: Now, when the Tangs told you that they didn't want to disclose their assets, why didn't you just tell them they have to disclose them or insist that they disclose them?

A: Well, I am not a financial advisor, and I would be remiss—it would not be right for me to tell the Tangs what to disclose with respect to their personal assets. If Richard and Anna Tang decided to provide asset information and I demanded that they do that, there was always that potential possibility that Mr. Madison could say that he wasn't willing to accept the hundred thousand and go after Anna and Richard Tang for whatever assets they were listing and giving to him. So I couldn't take that risk. I wouldn't do that to the Tangs. That

would be their decision that they'd have to make on their own.

(Id. at 175:12–176:1).

Varela spoke with the Tangs again on January 19, 2010. During the call, she once again explained why there might be additional coverage through a commercial policy and asked Mrs. Tang to follow up. (Id. at 179:2–14). Varela also claimed to have advised the Tangs once more that they had a right to consult with an attorney regarding their personal assets and that it was "up to them to decide whether they wanted to provide that asset sheet to Mr. Madison." (Id. at 179:19–180:2). According to Varela, Mrs. Tang again indicated that she would possibly consult with an attorney concerning the asset sheet. (Id. at 180:3–13). By this point, however, Varela felt that Madrigal's offer "could never be accepted" on the terms in the demand letter because she "knew that the Tangs didn't want to disclose their asset information," and because she "could not give [Madison] a check without securing a signed release for both Richard and Anna Tang." (Id. at 184:7–22).

Varela wrote a letter to the Tangs confirming the contents of their January 19, 2010 conversation. (Id. at 178:20–22). Varela's letter stated in part, "although we do not believe Richard Tang was the proximate cause of the accident, given the gravity of the injuries, the exposure may exceed your policy limits of $100,000. Therefore, we must advise you have the right to consult an attorney, at your own expense, to safeguard and protect your personal assets." (Tr. Exh. 248). Mrs. Tang interpreted Varela's letter simply to mean that "Allstate will take care of the problem." (Tang, Tr. 11/20/15 PM at 49:2–3).

Following receipt of Madison's January 15, 2010 demand letter, Varela hired an investigator to conduct witness interviews.

(Varela, Tr. 11/16/15 at 187:18–21). The investigator interviewed three of the four witnesses Madison had identified (Allstate was unable to locate the fourth), who Varela stated "basically said they did not witness the accident" and therefore could not provide evidence showing that Mr. Tang was responsible for Madrigal's injuries. (Id. at 188:10–18). On January 22, 2010, Varela spoke with Madison to explain that the witnesses they had reached did not provide evidence of Mr. Tang's liability, and to obtain additional medical documents. (Id. at 189:3–14). Madison told her that Allstate had all of the information it needed and all of the medical records he had. (Id. at 189:17–19; see also Madison, 11/18/15 AM at 50:21–23). Madison also told her that Madrigal "was still in a wheelchair, but was getting better." (Varela, Tr. 11/16/15 at 189:24–25; Walker, Tr. 11/19/15 AM at 68).

Allstate's investigator eventually located an eyewitness named Fidel Avendano, who was not among the witnesses Madison identified, who contradicted Mr. Tang's version of the accident and placed responsibility for the accident on Mr. Tang. (Varela, Tr. 11/16/15 at 192:3–21, 193:15–19 & 194:7–23). Varela received the investigator's report of Avendano's interview on Saturday, January 23, 2010, and called the Tangs that same day. (Id. at 192:17–21 & 195:2–7; see also Tr. Exh. 47). Mr. Tang, either through an interpreter or through Mrs. Tang, purportedly did not change his version of the accident. (Varela, Tr. 11/16/15 at 196:7–18).

On Monday, January 25, 2010, Varela arranged for a meeting with Karen Cohn, who was temporarily serving as her manager, and Allstate evaluation consultant John Gellatly. (Id. at 197:10–19; see also Gellatly, Tr. 11/12/15 PM at 103). According to Varela, as of January 25, 2010, she had approximately $34,000 in medical bills

and no evidence of Madrigal's prospective medical expenses or lost wages. (Varela, Tr. 11/16/15 at 206:2–15). Varela told Cohn and Gellatly about the $34,000 bill. They discussed the potential value of the case, but did not discuss whether Madrigal was insured. (Id. at 199:20–24). Varela testified that she erroneously assumed during her conversation with Cohn and Gellatly that Madrigal was insured because Varela had overlooked references in the file that Madrigal was uninsured. (Id. at 200:4–9). Varela asked for authorization to offer the full $100,000 policy limits, despite the terms in the demand that she considered problematic, because she assumed that Madrigal, as an insured driver, would be eligible for pain and suffering damages. (Id. at 199:4–8, 200:19–23 & 204:7–13). According to Varela, although "there was no discussion about accepting the demand" on its own terms because "[t]here were too many problems with it," they decided that Varela should extend an offer for policy limits on "whatever terms we could." (Id. at 199:4–12 & 201:6–7).

Varela testified that she spoke with the Tangs on January 28, 2010 and informed them that Allstate would make a policy limits offer of $100,000. (Id. at 211:4–15). Varela claimed that she did not tell the Tangs that Allstate would accept Madrigal's demand, as that would require the Tangs to provide an asset sheet, among other terms that Allstate could not meet. (Id. at 211:21–212:9). Varela testified that she once again advised the Tangs that they had the right to consult with an attorney about whether to disclose their assets. (Id. at 211:15–18). Varela's notes of the discussion stated:

> Insured [Mrs. Tang] asked must they respond to the asset list. She says she owns a house but it's on an upside-down payment. And although Anna Tang owns a store, it's not doing well with the

current economy. I explained I'm not an attorney and I can only provide updated information. This is probably the fifth or sixth time I've explained their right to hire an attorney at their own expense to protect their rights and their assets.

(Varela, Tr. 221:18–25; see also Tr. Exh. 51). According to Varela, during each of the "five or six conversations" she had with the Tangs explaining to them that "the asset sheet was something that Mr. Madison was requiring as one of his terms," the Tangs "told [her] they did not want to disclose their assets or that information." (Varela, Tr. 11/16/15 at 222:4–8). Nonetheless, Varela stated that the Tangs asked her to fax the January 15, 2010 demand letter to Dobbin Lo so they could discuss the asset sheet issue. (Id. at 214:24–215:4 & 214:12–18). Varela sent the fax to Dobbin Lo that same day (i.e., January 28, 2010). (Id. at 214:24–215:4 & 220:10–12).

Contrary to Varela's version of the conversation, Mrs. Tang stated that during the January 28, 2010 call, Varela told her that Allstate was "going to settle the policy limited [sic] demand," and that she (Mrs. Tang) believed the settlement would be paid "as of that day." (Tang, Tr. 11/20/15 PM at 49:8–17). Mrs. Tang claimed never to have heard of Dobbin Lo, stating that she did not "even know who Dobbin Lo is to start with," and denied that she ever asked Dobbin Lo to represent her husband, or that she told Varela that she was going to consult with Dobbin Lo about whether or not she and her husband should provide an asset sheet. (Id. at 41:19–25, 42:3–4 & 50:11–15).[10] Mrs. Tang also categorically denied that she ever refused to give her asset information or that

she did not wish to provide an asset sheet. (Id. at 48:16–19 & 51:10–13).

On January 29, 2010, Varela sent Madison a letter offering to pay policy limits. The terms of the Allstate letter required a release (without identifying in the letter itself that Anna Tang was an insured) before the check could be delivered, but did not require the Tangs to provide an asset sheet. (Varela, Tr. 11/17/15 AM at 16:12–24 & 17:20–18:2; Tr. Exh. 3). The letter also notified Madison that although Allstate had provided its "insured" with a copy of the January 15, 2010 demand letter, "[we] must allow our insured to make the decision regarding providing confidential information with respect to their assets." (Varela, Tr. 11/17/15 at 18:3–4 & 21:4–7). Varela copied Anna and Richard Tang on the letter. (Tr. Exh. 3). Varela did not indicate that there were defects in Madrigal's original demand, i.e., that Madrigal's demand was defective for not specifically identifying Anna Tang.

Varela explained that she did not tell Madison in the January 29, 2010 letter that the Tangs had refused to disclose their assets because "just the day before—it was the 28th—[the Tangs] informed [her] that they were going to go ahead and consult their lawyers with regards to their decision on what to do with the asset list," and had requested that she fax a copy of the January 15, 2010 demand letter to Dobbin Lo, which she did. (Varela, Tr. 11/17/15 AM at 21:15–24). Varela also testified that after sending the January 29, 2010 letter, she followed up with the Tangs "a couple of times" about asset disclosure issues, and that in the end, "both Mr. and Mrs. Tang said that their final decision was not to disclose their assets." (Id. at 22:21–25).

---

**10.** Although Mrs. Tang claimed that she had never heard of Dobbin Lo specifically, she did acknowledge that her husband "[got] himself

a lawyer or something" after the accident. (Tang, Tr. 11/20/15 PM at 41:9–14).

Madison testified that Varela did not contact him before sending the January 29, 2010 letter to "explain what she was doing." (Madison, Tr. 11/17/15 PM at 123:14–16). Furthermore, Madison claimed that Allstate never informed him that there were any potential problems with the January 15, 2010 demand letter:

Q Did you in any way prohibit Allstate from picking up the phone and, before they made any formal counteroffer, identifying issues or problems to resolving the case?

A No. In fact, we had conversations.

Q Did Allstate ever ask you for more time?

A No.

Q Did Allstate ever say we have to resolve this issue of course and scope, so we need more time?

A No.

Q Did Allstate say we have to resolve this issue of a release, so we need more time?

A No.

Q Did Allstate say we have to resolve this issue of an asset sheet. Do you need one from Anna Tang? Don't you need one from Anna Tang? Anything, and ask for more time?

A None of this occurred, Mr. Hom-ampour.

(Madison, Tr. 11/18/15 PM at 86:4–20).

Varela spoke with the Tangs at least twice on February 1, 2010. (Varela, Tr. 11/17/15 AM at 25:4–12). That same day, the Tangs faxed their declarations stating that they had no additional insurance coverage and that Mr. Tang was not acting in the course and scope of business at the time of the accident. (Varela, Tr. 11/16/15 at 225:14–226:4 & 226:13–15; id. 11/17/16 AM at 24:16–24; see also Tr. Exh. 60). According to Varela, Mrs. Tang confirmed during these conversations that their final decision was not to provide an asset sheet. However, Mrs. Tang testified that Varela's testimony was "false" and that she did not say anything about a "final decision" regarding an asset sheet. (Tang, Tr. 11/20/15 PM at 59:19–60:3). Nonetheless, it was undisputed that the Tangs never told Varela what assets they owned, either separately or jointly. (Varela, Tr. 11/16/15 at 223:17–224:4; Tang, Tr. 11/20/15 PM at 75:5–11).

According to Varela, she realized after she sent the January 29, 2010 offer that she had overlooked the fact that Madrigal was uninsured, which meant that general damages for pain and suffering were not available. (Varela, Tr. 11/17/15 AM at 30:12–31:1). On February 4, 2010, Varela spoke with Madison to clarify Madrigal's uninsured status. (Id. at 31:25–32:5). It was the first time that Varela claims to have spoken with Madison since September 2, 2009, when Madison had told Varela that he would not provide her with the authorizations requested by Allstate but would send the relevant records. (Id. at 31:17–24). Varela told Madison that she had made the January 29, 2010 policy limits offer on the erroneous assumption that Madrigal was insured, but that she was willing to honor the offer if Madison was willing to accept it. (Id. at 32:5–13). According to Varela, Madison stated that he was not "accepting or denying" the offer, and told her that she had all of Madrigal's medical records. (Id. at 32:13–24). Varela told Madison that she would follow up with her managers. (Id. at 32:25–33:3).

After her phone call with Madison, Varela spoke to Cohn and Allstate "claims process expert" Richard Vellanoweth. (Id. at 33:4–7; see also Vellanoweth, Tr. 11/19/15 PM at 25). Varela told them that, contrary to her prior assumptions, Madrigal was uninsured, Madrigal's counsel had only $34,000 in medical bills and he had also failed to submit any evidence of Ma-

drigal's future medical expenses or current medical condition. (Varela, Tr. 11/17/15 AM at 33:8–14). It was decided that Varela could "revise" the offer to pay only for the out-of-pocket medical expenses that Madrigal had documented. (Id. at 33:17–19).

On February 4, 2010, only days after the January 29, 2010 policy limits offer, Varela sent a new offer via fax to Madison. Varela dropped the amount of the offer to $34,398, with an invitation to Madison to provide further medical bills for Allstate's consideration. (Id. at 34:22–24 & 36:7–12). It is undisputed that Varela did not copy the Tangs or Dobbin Lo on the letter. (Tr. Exh. 57). Mrs. Tang testified that Allstate never told her that it was going to offer only $34,000. (Tang, Tr. 11/20/15 PM at 49:18–20). Mrs. Tang also stated that she never received a copy of Varela's February 4, 2010 letter to Madison. (Id. at 49:23–25).

According to Mrs. Tang, at some point "later in February" she had a conversation with Varela about an asset sheet. (Id. at 50:24–51:2). Mrs. Tang claimed to have told Varela that she did not need an attorney to discuss the possible consequences of an asset disclosure because her "house was upside down,"[11] and asked Varela if she had "to sign for it" (i.e., an asset sheet). (Id. at 51:1–9 & 74:22–75:4). Mrs. Tang testified that Varela said "no, you don't have to sign for it" and that the decision was up to Mrs. Tang if she wished to provide one. (Id. at 52:1–10). Throughout this conversation, Mrs. Tang believed that Allstate was going to pay the policy limits demand and settle the case. (Id. at 54:10–15). Mrs. Tang stated that on February 8, 2010, Varela sent the Tangs a letter confirming their conversation, and that the letter accurately reflected the contents of their conversation. (Id. at 90:4–91:4; see also Tr. Exh. 5). However, Mrs. Tang further stated that Varela never explained to her what an asset sheet was, never provided a sample of an asset sheet, and never explained what the consequences might be of failing to provide an asset sheet. (Tang, Tr. 11/20/15 PM at 53:4–7 & 53:21–23).

On February 8, 2010, Madison called to confirm that Allstate had withdrawn its $100,000 offer and was standing by its revised $34,398 offer. (Varela, Tr. 11/17/15 AM at 37:15–18 & 38:9–15). According to Varela, when she confirmed, Madison seemed "very eager" and insisted that Varela re-send the fax, which she did. (Id. at 37:18–24). On February 11, 2010, Madison sent Varela a letter "memorializing" their February 8, 2010 conversation, which he erroneously identified as having taken place on February 10. (Id. at 39:1–41:23; Madison, Tr. 11/17/15 AM at 133:1–10; see also Tr. Exh. 61). According to Varela, the February 11, 2010 letter informed her for the first time that Madrigal was working as a courier at the time of the accident, and stated that Madrigal would be filing suit against Mr. Tang. (Varela, Tr. 11/17/15 AM at 39:1–41:23; Madison, Tr. 11/17/15 AM at 133:19–22). According to Madison, Varela never called him to say she was confused by his February 11, 2010 letter. (Id. at 135:17–20).

Following the conversation with Madison, Varela spoke with Vellanoweth. (Varela, Tr. 11/17/15 AM at 44:4–6). They agreed that in light of the information about Madrigal's employment (i.e., that he might have lost income as damages), it

---

11. However, as stated at trial, during her deposition, Mrs. Tang affirmed that at the time of the January 15, 2010 settlement demand, she owned a home and some cars and had money in bank accounts, and was concerned about protecting that money from Ma-

drigal's claim if the claim did not settle. (Tang, Tr. 11/20/15 PM at 72:24–13). Mrs. Tang stated that she did not tell Allstate about that concern because Allstate "already told [her] they were going to settle, and that's what we were expecting." (Id. at 73:14–17).

would be in the best interest of the Tangs to put the $100,000 offer "back on the table." (Id. at 44:12–23). On February 19, 2010, Varela sent Madison a letter extending the $100,000 offer contingent upon the execution of the release that Varela had previously sent, which included releases for both Mr. and Mrs. Tang. (Id. at 45:11–15 & 46:12–17). Varela's letter stated "[i]n response to your February 11, 2010 letter, please be advised that we do agree to pay our $100,000 policy limit in settlement of your client's claims." (Tr. Exh. 7) (emphasis added). Madison responded by a letter the same day, stating "In response to your fax today, there has been no 'confusion.' Allstate has clearly rejected the policy limit demand of $100,000 in writing on February 4, 2010 and verbally to me on February 10, 2010 [sic] as confirmed by my fax of February 11, 2010. We are moving forward against your insured as if the policy were open as our 30 day policy limit demand letter of January 14, 2010 [sic]. Please put your insured on notice." (Varela, Tr. 11/17/15 AM at 47:1–20; see also Tr. Exh. 8). Mrs. Tang testified that she never received a copy of Madison's February 19, 2010 letter. (Tang, Tr. 11/20/15 PM at 60:20–61:1). Varela testified that she made at least twelve additional policy limit settlement offers during the subsequent months, none of which was accepted. (Varela, Tr. 11/17/15 AM at 49:24–50:4 & 53:13–16 (marking Varela's subsequent policy limit offer letters as Tr. Exhs. 274, 276, 277, 278, 279, 280, 282, 283, 284, 285, 287, 289, 290, 291, 293, 294, 295 & 296).

Madrigal filed suit against Mr. Tang on September 17, 2010. (Dkt. No. 297 at 28 (Stipulated Fact No. 5)). Mrs. Tang was added as a defendant after the suit began, but was dismissed before trial, and the case proceeded only against Mr. Tang. (Varela, Tr. 11/17/15 PM at 25:21–26:6; Madison, Tr. 11/17/15 PM at 102:18–22 & 106:5–8). On October 4, 2012, the jury rendered a verdict finding that Richard Tang was 100% at fault for the accident and awarded Madrigal damages that, with costs, exceeded $10 million. (Tang, Tr. 11/20/15 PM at 57:6–12). Following the judgment, Allstate paid Madrigal the policy limit of $100,000 in partial satisfaction of the judgment. (Varela, Tr. 11/17/15 AM at 56:7–10). In addition, Madrigal and the Tangs entered into an Assignment of Rights agreement in which Madrigal agreed not to execute the ultimate judgment in exchange for all assignable rights that the Tangs possessed against Allstate. (Tang, Tr. 11/20/15 PM at 100:21–101:5).

## III.

## ELEMENTS OF A BAD FAITH FAILURE TO SETTLE CLAIM

 The implied covenant requires an insurer to accept a reasonable third party offer to settle within policy limits against its insured. Graciano v. Mercury General Corp., 231 Cal.App.4th 414, 425, 179 Cal. Rptr.3d 717 (2014); see also DeWitt v. Monterey Ins. Co., 204 Cal.App.4th 233, 236, 138 Cal.Rptr.3d 705 (2012) (same). "[T]he breach of the insurer's obligation occurs at the time when it indulges in the unwarranted rejection of a reasonable compromise offer within the policy limits." Critz v. Farmers Ins. Group, 230 Cal. App.2d 788, 797, 41 Cal.Rptr. 401 (1964), disapproved on other grounds by Crisci v. Security Ins. Co. of New Haven, Conn., 66 Cal.2d 425, 429–30, 58 Cal.Rptr. 13, 426 P.2d 173 (1967)). "An insurer's 'good faith' is essentially a matter of fact." Allen v. Allstate Ins. Co., 656 F.2d 487, 489 (9th Cir. 1981) (as amended) (citing Kinder v. Western Pioneer Ins. Co., 231 Cal.App.2d 894, 900, 42 Cal.Rptr. 394 (1965)); see also Critz, 230 Cal.App.2d at 796, 41 Cal.Rptr. 401 ("Good or bad faith is a question of fact in each case.").

 To prevail on a claim for breach of the implied covenant of good faith and fair dealing, an insured must show: (1) the claimant brought a claim against the insured that was covered by the insurer's policy; (2) the insurer failed to accept a reasonable settlement demand for an amount within policy limits; (3) the insurer's failure to accept the settlement demand was unreasonable, which means without proper cause; and (4) a monetary judgment was entered against the insured for a sum greater than the policy limits. (CACI 2334, as revised 12/2015). The crux of a bad faith claim is an "unwarranted rejection of a reasonable settlement offer." Crisci, 66 Cal.2d at 430, 58 Cal.Rptr. 13, 426 P.2d 173. Factors that a jury may consider in determining whether the offer to settle was reasonable include whether:

(1) [the offer's] terms are clear enough to have created an enforceable contract resolving all claims had it been accepted by the insurer, (2) all of the third party claimants have joined in the demand, (3) it provides for a complete release of all insureds, and (4) the time provided for acceptance did not deprive the insurer of an adequate opportunity to investigate and evaluate its insured's exposure.

Graciano, 231 Cal.App.4th at 425, 179 Cal. Rptr.3d 717 (internal citations omitted).

 " '[The] implied covenant obligates the insurance company ... to make reasonable efforts to settle a third party's lawsuit against the insured.' " Id. (quoting PPG Industries, Inc. v. Transamerica Ins. Co., 20 Cal.4th 310, 312, 84 Cal.Rptr.2d 455, 975 P.2d 652 (1999) (emphasis added)). However, "mere errors by an insurer in discharging its obligations to its insured 'does [sic] not necessarily make the insurer liable in tort for violating the covenant of good faith and fair dealing ...' " Graciano, 231 Cal.App.4th at 425, 179 Cal.Rptr.3d 717. (citations omitted). Liability does not attach where the refusal to settle is the result of an "honest, innocent mistake." Id. (quoting Tomaselli v. Transamerica Ins. Co., 25 Cal.App.4th 1269, 1280–81, 31 Cal. Rptr.2d 433 (1994)). Rather, " 'the insurer's conduct must ... have been unreasonable.' " Graciano, 231 Cal.App.4th at 425, 179 Cal.Rptr.3d 717 (quoting Brandt v. Superior Court, 37 Cal.3d 813, 819, 210 Cal.Rptr. 211, 693 P.2d 796 (1985) (emphasis in original)). "Bad faith" implies unfair dealing rather than mistaken judgment or poor prognostication. Critz, 230 Cal.App.2d at 796, 41 Cal.Rptr. 401. However, the insured is not required to show "actual dishonesty, fraud, or concealment" on the insurer's part. Crisci, 66 Cal.2d at 430, 58 Cal.Rptr. 13, 426 P.2d 173.

 Throughout the settlement process, the claimant and the insurance company deal at arm's length. Critz, 230 Cal.App.2d at 797, 41 Cal.Rptr. 401. While a reasonable offer must include enough time for the insurer to conduct an adequate investigation, it is well settled that " 'the third party is entitled to set a reasonable time limit within which the insurer must accept the settlement proposal ....' " Graciano, 231 Cal.App.4th at 434, 179 Cal.Rptr.3d 717 (quoting Martin v. Hartford Acc. & Indem. Co., 228 Cal. App.2d 178, 185, 39 Cal.Rptr. 342 (1964)). At the same time, if additional time is needed to investigate and assess an offer in good faith, the insurer should inform the claimant of the need for additional time, which may not be unreasonably withheld. McDaniel v. GEICO General Ins. Co., 55 F.Supp.3d 1244, 1262 (E.D. Cal. 2014), appeal docketed, No. 14–17203 (9th Cir. Nov. 5, 2014) (citing Critz, 230 Cal.App.2d at 798, 41 Cal.Rptr. 401). Depending on the circumstances, whether an insurer has "refused" an "offer," including whether the insurer could have acted in a different manner in light of an offer's deadline, may be a question for the jury. McDaniel, 55 F.Supp.3d at 1259 (citing Coe, 66 Cal.

App.3d at 994, 136 Cal.Rptr. 331). However, "[w]here the potential value of the claim is large in relation to the policy limit, [and] where the claimant's case is comparatively strong and the potential defendant's weak, rejection of an initial offer to settle at or near the policy limit may then and there constitute a breach of the implied covenant of good faith." Critz, 230 Cal.App.2d at 798, 41 Cal.Rptr. 401.

■ The claimant "is under no duty to keep negotiations open after rejection of an early settlement offer." Id. at 797, 41 Cal.Rptr. 401. Rather, the claimant "may take an initial rejection at face value and choose thereafter to submit his claim to the uncertainties of litigation." Id. Accordingly, " '[e]ven if the insurer attempts to resume negotiation by a belated offer of the policy limit, that action does not necessarily relieve it of the onus of an earlier bad faith rejection.' " Schlauch v. Hartford Accident & Indem. Co., 146 Cal.App.3d 926, 936, 194 Cal.Rptr. 658 (1983) (quoting Critz, 230 Cal.App.2d at 789, 41 Cal.Rptr. 401); see also McDaniel, 55 F.Supp.3d at 1262 ("If an offer's time limit is reasonable, and the settlement offer itself is otherwise reasonable, but the insurer does not accept the offer within the time limit, then the insurer has breached the covenant of good faith and fair dealing and cannot escape liability by attempting to accept an expired or withdrawn offer.").

## IV.

### ALLSTATE'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. The Parties' Contentions

Allstate argues that it is entitled to judgment as a matter of law on Plaintiffs'

bad faith claims for two independent reasons. First, Allstate contends that Madrigal's January 15, 2010 demand was unreasonable as a matter of law because it did not specifically offer to release Mrs. Tang. (JMOL Motion at 1, 6–18; JMOL Reply at 3–9). According to Allstate, the interpretation of a settlement demand is an issue of law for the court to decide, and this Court's prior decision to submit the determination of the reasonableness of Madrigal's demand to the jury was erroneous as a matter of law.[12] (JMOL Motion at 6–7). Allstate further argues that the professed ignorance of Madrigal's counsel of the existence of Mrs. Tang did not make his demand reasonable and is irrelevant as a matter of "basic contract law" because "an offeror's undisclosed, subjective belief of the reasonableness of his offer" does not control. (Id. at 12). For the same reason, Allstate contends that counsel's undisclosed willingness to include Mrs. Tang in the settlement is irrelevant. (Id. at 14–15).

In further support of its "failure to release" argument, Allstate asserts that Plaintiffs' argument that Allstate had a duty to seek clarification of the terms of Madrigal's offer is unsupported by law and ultimately irrelevant because after Allstate put Madrigal on notice of Mrs. Tang's existence in its January 29, 2010 letter, Madrigal's counsel neither agreed to modify his existing demand nor made a new demand including Mrs. Tang. (Id. at 16–17). Furthermore, Allstate notes that the Court rejected Plaintiffs' request for an instruction on the duty to clarify on the grounds that the evidence did not show that Allstate misunderstood the terms of Madrigal's offer. (JMOL Reply at 9 (citing

---

12. In its Reply, Allstate qualifies its contention that the reasonableness of a settlement demand is categorically a pure question of law by arguing that the specific question of whether a settlement demand includes all insureds is a question of law. (JMOL Reply at 4 & n.2).

Order Re Certain Jury Instructions, Dkt. No. 171)). Finally, Allstate contends that it was prohibited by law from disclosing that Mrs. Tang was an insured without her consent. (JMOL Reply at 5). Because Mrs. Tang was not included in the demand, Allstate insists that not only was the demand "unreasonable," but also that its failure to accept the demand was reasonable. (JMOL Motion at 17–18; JMOL Reply at 5).

Second, Allstate contends that Allstate's failure to accept Madrigal's January 15, 2010 demand was reasonable because "the undisputed evidence at trial" showed that Allstate could not comply with the settlement demand's condition requiring Mr. Tang to provide an "asset sheet of all assets or lack thereof."[13] (JMOL Motion at 1, 19–22). According to Allstate, Varela discussed the asset sheet condition with the Tangs; the Tangs were aware of the condition; Allstate appropriately recommended that the Tangs consult an attorney or a financial adviser, which the Tangs chose not to do; and the Tangs never provided an asset sheet or otherwise disclosed to Allstate what assets Mr. Tang owned. (Id. at 20). Allstate also rejects any alleged contentions that industry custom

or practice required it to give Mr. Tang "legal advice" regarding the asset disclosure condition, or that it was derelict in failing to provide Mr. Tang with an asset disclosure form. (JMOL Reply at 10–12). As such, Allstate contends that it was incapable of accepting the demand for reasons beyond its control. (JMOL Motion at 21).

With respect to the failure of the demand to include an explicit release of Mrs. Tang, Plaintiffs argue preliminarily that the reasonableness of Madrigal's demand was not a pure question of law because there was a "factual dispute as to the terms of Madrigal's offer, the interpretation of those terms, the breach of the implied covenant of good faith and fair dealing, breach of that covenant, and what could/should have been done before rejection of the policy limits offer." (JMOL Opp. at 9). Plaintiffs note that the California Supreme Court has recognized that "'the reasonableness of a rejected settlement offer is often an issue of fact to be determined by the jury.'" (Id. at 10) (quoting Samson v. Transamerica Ins. Co., 30 Cal.3d 220, 243, 178 Cal.Rptr. 343, 636 P.2d 32 (1981)).

13. Allstate concedes that its written Rule 50(a) brief did not argue that Allstate could not comply with the demand because the Tangs did not provide an asset sheet. (JMOL Motion at 19 n.12). However, in its oral Rule 50(a) Motion, Allstate argued that "[t]he demand was also not capable of being accepted because the Tangs refused to provide an asset sheet—well, did not provide. I think there's a triable issue of fact of whether they refused, but they did not provide one. So Allstate never had in its possession an asset sheet that it could provide to Mr. Madrigal's attorney." (Klee JMOL Decl., Exh. C at 31–32).

The Court notes that Allstate's oral 50(a) motion simply argued that "the Tangs" did not provide an asset sheet, without clearly stating whose assets had to be disclosed. Furthermore, much of the testimony at trial con-

cerned whether Mrs. Tang was required to, or was willing to, disclose her assets. Allstate's 50(b) motion appears based on the more narrow contention that the demand could not be accepted because Allstate did not have an asset sheet disclosing Mr. Tang's assets. (See JMOL Motion at 20 ("Thus, the demand could not be accepted unless Mr. Tang disclosed his assets.")). However, Allstate repeatedly insisted at trial that in light of the Tangs' marital status, disclosure of Mr. Tang's assets necessarily implicated at least some of Mrs. Tang's assets as well. Accordingly, the Court concludes that Mrs. Tang's testimony concerning the asset disclosure condition of Madrigal's settlement demand is relevant to the instant argument, which is specifically limited to the disclosure of Mr. Tang's assets.

Furthermore, Plaintiffs emphasize that all of Allstate's correspondence prior to Madrigal's January 15, 2010 demand affirmatively identified only Richard Tang as the insured. (Id. at 10). According to Plaintiffs, exempting an insurer from liability because a settlement demand did not specifically refer to an insured whose existence the insurer did not disclose "would encourage insurance companies to hide the identity of potentially culpable insureds so that [they] could never have to pay a policy limits demand." (Id.). Plaintiffs further contend that in the cases upon which Allstate relies, the claimant knew of the existence of all relevant insureds, but deliberately offered to release only selected insureds. (Id. at 11) (citing Graciano). Finally, Plaintiffs argue that to the extent that Allstate was concerned about whether the release of Mrs. Tang was encompassed by the settlement demand's reference to an "appropriate release," Allstate had a duty to clarify any ambiguities before rejecting the demand. (Id. at 13–14) (citing, inter alia, Betts v. Allstate Ins. Co., 154 Cal.App.3d 688, 708 n.7, 201 Cal.Rptr. 528 (1984), & Coe v. State Farm Mut. Auto. Ins. Co., 66 Cal. App.3d 981, 991–92, 136 Cal.Rptr. 331 (1997)).

With respect to the asset disclosure condition, Plaintiffs argue that Allstate is not entitled to judgment as a matter of law because the evidence at trial established that Mr. Tang, through his wife's conversations with Varela, did not refuse to provide an asset sheet. (JMOL Opp. at 16–17). Plaintiffs assert that the evidence showed that there was no impediment to disclosure because the Tangs did not have any substantial assets. (Id. at 16). Plaintiffs also argue that Allstate's claim that it categorically could not comply with the asset disclosure requirement is not credible. Plaintiffs note that despite knowing that Mr. Tang was illiterate and was not fluent in English, Allstate did not provide him with a form to disclose his assets, even though it provided him a form so he could confirm that he had no other insurance and was not in the course or scope of employment at the time of the accident. (Id.). As such, Plaintiffs argue that Allstate could have obtained an asset sheet and bears responsibility for the failure to do so. (Id.).

**B. Standard For Judgment As A Matter Of Law**

Rule 50(b) provides:

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

■ "Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." Equal Emp't Opportunity Comm'n v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009). Accordingly,

"[a] Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion." Id. As such, "[t]he standard for granting a motion under Rule 50(b) is the same as the standard for granting a motion under Rule 50(a)." In re Homestore.com, Inc. Sec. Litig., 2011 WL 1564025, at *1 (C.D. Cal. Apr. 22, 2011) (quoting In re Vivendi Univ., S.A. Sec. Litig., 765 F.Supp.2d 512, 535 (S.D. N.Y. 2011)); see also 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (3d ed. 2008) ("The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a).").

■■■ Under Rule 50(a), if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for" a party on a particular issue, "the court may ... resolve the issue against the party; and grant a motion for judgment as a matter of law ...." Fed. R. Civ. P. 50(a)(1). A party seeking judgment as a matter of law has a "very high" standard to meet. Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002). A district court may grant judgment as a matter of law against a party only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." Jorgensen v. Cassiday, 320 F.3d 906, 917 (9th Cir. 2003) (citation and internal quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (judgment as a matter of law may be granted only where "there can be but one reasonable conclusion as to the verdict"); Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007) (judgment as a matter of law may not be granted unless the "evidence permits only one reasonable conclusion"); Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002) (the jury's verdict

must be upheld if there is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.") (internal citations omitted).

■■■ In sum, the standard for judgment as a matter of law "mirrors" the standard for summary judgment, "such that the inquiry under each is the same." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks and citation omitted). Accordingly, in reviewing a Rule 50 motion, "[t]he court ... may not make credibility determinations or weigh the evidence." Krechman v. County of Riverside, 723 F.3d 1104, 1110 (9th Cir. 2013) (internal quotation marks and citation omitted). Furthermore, the court must draw all reasonable inferences in favor of the nonmoving party. Reeves, 530 U.S. at 150, 120 S.Ct. 2097; see also Costa, 299 F.3d at 859 (the "high hurdle" a party must meet on a motion for judgment as a matter of law "recognizes that credibility, inferences and factfinding are the province of the jury, not [the] court").

## C. Allstate Is Not Entitled To Judgment As A Matter Of Law On Plaintiffs' Bad Faith Claims

Judgment as a matter of law is appropriate only when a jury would not have a legally sufficient evidentiary basis to find for the prevailing party on that issue. Krechman, 723 F.3d at 1110. Allstate has failed to show that the jury lacked a legally sufficient evidentiary basis to support the verdict for Plaintiffs on their bad faith claims. Accordingly, Allstate's Motion for Judgment as a Matter of Law is DENIED.

### 1. The Settlement Demand's Failure To Expressly Release Anna Tang

■■ Allstate argues that Madrigal's settlement demand was unreasonable as a

matter of law because it did not specifically offer to release Anna Tang. The gravamen of Allstate's position is that the "strict compliance" language in the demand, which was specifically directed to Mr. Tang only, precluded any possible interpretation of the demand that would permit a release of Mrs. Tang, and thereby made it "impossible" for Allstate to accept the demand as presented. (See JMOL Motion at 7–9; see also Cannon, Tr. 11/20/15 PM at 136:5–21).

 As a preliminary matter, the Court finds that the question of the reasonableness of Madrigal's settlement demand was properly submitted to the jury because the meaning of the demand's terms and conditions depended on the resolution of many disputed facts. "Whether an issue is a question of law or a question of fact is a substantive question, to which state law applies" in diversity cases. Encompass Ins. Co. v. Coast Nat. Ins. Co., 764 F.3d 981, 984 (9th Cir. 2014). Under California law, it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." Cty. of Solano v. Handlery, 155 Cal.App.4th 566, 574, 66 Cal.Rptr.3d 201 (2007) (internal quotation marks and citation omitted; emphasis added); see also Barnett v. State Farm Gen. Ins. Co., 200 Cal.App.4th 536, 543, 132 Cal.Rptr.3d 742 (2011) ("The interpretation of an insurance policy is … a question of law when … the facts are

undisputed.")[14] (emphasis added); Hervey v. Mercury Cas. Co., 185 Cal.App.4th 954, 962–63, 110 Cal.Rptr.3d 890 (2010) ("When the facts are undisputed, … the interpretation of a contract … is a question of law.") (emphasis added). Because the facts here were strongly disputed, the Court properly required a jury to resolve the reasonableness of Madrigal's settlement demand.

 The California Supreme Court has specifically recognized that "the reasonableness of a rejected settlement offer is often an issue of fact to be determined by the jury." Samson, 30 Cal.3d at 243, 178 Cal.Rptr. 343, 636 P.2d 32 (citing Critz, 230 Cal.App.2d at 796–97, 41 Cal.Rptr. 401); Brown v. Guarantee Ins. Co., 155 Cal.App.2d 679, 689, 319 P.2d 69 (1957) (same). Furthermore, where facts are disputed, "expert testimony is competent to establish whether a particular contract meets particular industry criteria and to establish the meaning of technical terms used in insurance industry practice." Texas Commerce Bank v. Garamendi, 11 Cal. App.4th 460, 486, 14 Cal.Rptr.2d 854 (1992). Should expert testimony conflict, as it did here, judging the "credibility of expert witnesses is a matter for the jury." Williams v. Volkswagenwerk Aktiengesellschaft, 180 Cal.App.3d 1244, 1264, 226 Cal.Rptr. 306 (1986). The jury was properly entrusted with the determination of the reasonableness of Madrigal's offer.[15]

---

14. While Barnett specifically addresses the interpretation of insurance policies, not settlement agreements, there is no principled reason to exempt settlement agreements from the general principle that the interpretation of a written instrument is not a pure question of law when facts, such as the meaning and effect of terms of art used in the instrument, are disputed.

15. Similarly, as one court has explained,

This court has recognized that ordinarily "[w]hether the insurer has acted unreasonably, and hence in bad faith, in rejecting a settlement offer is a question of fact to be determined by the jury." (Cain v. State Farm Mut. Auto. Ins. Co. (1975) 47 Cal. App.3d 783, 792, [121 Cal.Rptr. 200].) This follows from the nature of the issue: "A determination respecting the presence or absence of good faith involves an inquiry into motive, intent and state of mind. Conclusions concerning such matters, in most

Madrigal's January 15, 2010 settlement demand was directed to "Defendant RICHARD TANG and his insurance carrier," and did not expressly include an offer to release Mrs. Tang. To meet the terms of the settlement, the demand required that Allstate affirmatively satisfy four conditions by delivering, within 30 days: (1) a photocopy of "all available liability insurance policies," (2) an "appropriate release of all claims," (3) a declaration stating that "the insured" has no other liability insurance policies and was not acting in the course and scope of his employment at the time of the accident, and an "asset sheet of all assets or lack thereof," and (4) a settlement draft "equal to the amount of all available liability insurance policy limits." (Tr. Exh. 251 at 3). The demand further provided that that performance "of some, but not all, of the above condition[s] precedent will be deemed" to be a counteroffer, and that any counteroffers will be rejected. (Id. at 3–4).

It is undisputed that, despite months of communications with the Tangs and the lawyer for Madrigal, Allstate's adjuster, Teresa Varela, failed to disclose Mrs. Tang's existence or Mrs. Tang's status as an insured until Allstate's policy limits offer of January 29, 2010, two weeks after Madrigal had tendered his demand. Even

in Varela's January 29, 2010 letter, Varela only mentions Richard Tang as "the insured" and he is identified as "the insured" in capital letters at the top of the page.

For the very first time, in "copied" section of the January 29, 2010 letter, Varela identifies Mrs. Tang. However, the letter itself does not advise Madison that Madrigal's demand was defective for failing to include Anna Tang. (Varela, Tr. 11/17/15 AM at 16:12–24 & 17:20–18:2). It is also undisputed that from July 30, 2009, when Varela was assigned to Madrigal's case, through January 15, 2010, when Allstate received Madison's demand letter, Varela sent Madison at least seven letters, all of which identified only Richard Tang as Allstate's insured, without any mention of Anna Tang as a second insured. (See Tr. Exhs. 214 (Aug. 4, 2009); 217 (Aug. 21, 2009); 234 (Sept. 24, 2009); 236 (Sept. 28, 2009); 148 (Nov. 2009); 149 (Dec. 11, 2009); 247 (Jan. 15, 2010)). Varela and Madison also spoke on the phone at least once, on September 2, 2009, before Madison sent the demand.[16] (Varela, Tr. 11/16/15 at 139:21–140:4). It is similarly undisputed that Varela did not inform Madison about Mrs. Tang during this conversation, even though Varela testified that she had determined as early as Au-

---

cases, are founded upon inferences." (Davy v. Public National Ins. Co. (1960) 181 Cal. App.2d 387, 397, [5 Cal.Rptr. 488]; accord, Palmer v. Financial Indem. Co. (1963) 215 Cal.App.2d 419, 430, [30 Cal.Rptr. 204].) The question becomes one of law only when, because there are no conflicting inferences, reasonable minds could not differ. (Marsango v. Automobile Club of So. Cal. (1969) 1 Cal.App.3d 688, 696, [82 Cal.Rptr. 92]; Davy v. Public National Ins. Co., supra, at p. 400, 5 Cal.Rptr. 488; Hodges v. Standard Accident Ins. Co. (1961) 198 Cal. App.2d 564, 574, [18 Cal.Rptr. 17].)
Walbrook Ins. Co. v. Liberty Mut. Ins. Co., 5 Cal.App.4th 1445, 1454–55, 7 Cal.Rptr.2d 513 (1992) (brackets in original).

16. Varela testified that she did not talk to Madison at any time between their initial telephonic conversation on September 2, 2009 and February 4, 2010, when Madison told her that Madrigal was uninsured. (Varela, Tr. 11/17/15 AM at 30:12–31:1). However, Varela also testified that she called and spoke with Madison on January 22, 2010 to ask him about Madrigal's lack of medical records. (Varela, Tr. 11/16/15 at 188:24–189:14). There is no evidence in the record that Varela and Madison had any conversations between their first call on September 2, 2009 and January 22, 2010, i.e., one week after Madison sent his demand letter and one week before Allstate sent its policy limits offer letter.

gust 21, 2009 that Mrs. Tang could potentially be liable because she was the registered owner of the vehicle Mr. Tang was driving and of the business where Mr. Tang worked. (Varela, Tr. 11/13/15 PM at 111:9–112:11). Allstate knew of Mrs. Tang's existence, but no evidence even suggests that Allstate ever shared that knowledge until after Madrigal made a settlement demand.

Allstate argued at the February 8 and May 6, 2016 hearings that the interpretation of Madrigal's settlement demand could not turn on Madison's "subjective intent" regarding whether he would have released Mrs. Tang or would have considered a request for a release of Mrs. Tang to be encompassed by the "appropriate release" language in the demand. (See Dkt. No. 300 (transcript of Feb. 8, 2016 hearing) at 32–37). However, this argument, which is based in part upon Allstate's contention that the reasonableness of a settlement offer is purely a question of law, is unavailing.

The parties disputed what the term "appropriate release" would mean to a reasonable insurer. The jury's resolution of that dispute did not turn on Madison's "subjective intent", but on how Madrigal's settlement demand would be understood in the insurance industry. Allstate argues that the only possible interpretation of Madrigal's settlement demand is that it applied only to Mr. Tang and that an "appropriate release" cannot be understood to encompass any other insureds. As such, Allstate contends that it could not possibly have insisted on a release of Mrs. Tang without deviating from the terms of the settlement. However, to the extent that the term "appropriate release," as understood in the industry could be understood to incorporate multiple insureds, whether those insureds were previously disclosed to the injured party or not, Allstate's argument

that the settlement demand was fatally defective as a matter of law for failing to include a specific release of Mrs. Tang falls apart. See e.g., Augustin v. General Accident Fire and Life Assurance Corp., 283 F.2d 82, 83–84 (7th Cir. 1960) (finding that a "proper release" could have been executed relieving insurance company and its insured of all liability, where injured party's attorney inadvertently omitted insured's name from release language in settlement demand).

Evidence presented at trial permitted the jury to reasonably conclude that Allstate's interpretation of the demand was far more inflexible than industry standards would require. A jury could reasonably determine that the "strict compliance" language, which Madison testified was simply "standard jargon" in the industry intended to "make sure [insurers] do what they're supposed to do," was not so strict as to prohibit any discussion about the scope and meaning of a particular condition. (Madison, Tr. 11/17/15 PM at 113:23–24).

Furthermore, Plaintiffs' expert testified that the demand letter's inclusion of a request for an "appropriate release" signified "appropriate for this case," which "may be something . . . that requires some follow-up clarification from Allstate." (Walker, Tr. 11/19/15 AM at 54:5–7; see also id. at 54:21–23 ("What would now be required, once you got [the demand], would be to seek clarification regarding whether or not Anna Tang is or can be included."); id. at 56:16–17 ("[Y]ou need clarification before you go ahead and respond to this [demand letter].")).

■ It is well settled under California law that "claimants are not required 'to begin settlement overtures with letter-perfect offers to which insurers need only respond 'Yes' or 'No.' An insurer's duty of good faith would be trifling if it did not require an insurer to explore the details of

a settlement offer that could prove extremely beneficial to its insured." <u>Graciano</u>, 231 Cal.App.4th at 429, 179 Cal. Rptr.3d 717 (quoting <u>Allen</u>, 656 F.2d at 490 (footnote omitted)); <u>see also</u> <u>Betts</u>, 154 Cal.App.3d at 708 n.7, 201 Cal.Rptr. 528 ("Allstate now challenges the sufficiency, competency, [and] adequacy of the Gallucci offers. Allstate summarily rejected these offers without any attempt to seek clarification—it felt them ambiguous or incomplete. Allstate cannot now in good conscience use its own failure to explore the settlement offer as a defense of its own breach of duty to tender the policy limits— exactly what the Gallucci attorneys were willing to accept."); <u>Coe</u>, 66 Cal.App.3d at 991, 136 Cal.Rptr. 331 (claimed uncertainty in settlement offer that failed to specify the parties "did not make the offer unacceptable <u>as a matter of law</u>" (emphasis in original)); <u>see also</u> <u>Kivi v. Nationwide Mutual Insurance Co.</u>, 695 F.2d 1285, 1288 (11th Cir. 1983) (settlement demand that omitted specific release of driver, subrogation rights and hospital lien not defective where insurance company did not mention items as impediment to settlement). Accordingly, the jury was not compelled to find that anything but compliance with the narrowest interpretation of the demand would necessarily constitute a rejection of the demand.

Even if the demand were strictly construed, however, Allstate has not shown that the inclusion of Mrs. Tang in the release would be considered a counteroffer and would not satisfy Madrigal's condition that Allstate submit an "appropriate release." <u>Graciano</u> instructs that a "reasonable" settlement demand "provides for a complete release of all insureds." <u>Graciano</u>, 231 Cal.App.4th at 425, 179 Cal.Rptr.3d 717. However, <u>Graciano</u> does not address how a demand may satisfy this requirement. <u>Graciano</u> does not require that the demand specifically identify each insured

by name or use any particular language to encompass all known and unknown insureds.

Defendant's arguments that rely on the Court's prior decision to exclude the instruction requested by Plaintiffs, i.e., the "duty to clarify" instruction, do not alter the outcome here. (JMOL at pp. 17–19). The fact that the Court declined to give such an instruction does not mean the jury was prohibited from finding that Allstate understood "appropriate release" to mean that Madrigal would release all insureds, based on the evidence at trial. Based on the information presented by Allstate prior to trial, the Court agreed with Allstate that no Allstate witness stated that he or she found the letter ambiguous. Therefore, the Court ruled in Allstate's favor when the Court declined to include the "duty to clarify" instruction. However, the jury was entitled to determine the credibility of Allstate's witnesses and evaluate all the evidence presented. The jury could reasonably have concluded that Allstate had a good faith obligation to inform Madison of Anna Tang's existence, if Allstate intended to later contend that Madison's January 15 demand was defective for omitting Anna Tang.

Here, the demand did not define the term "appropriate release," much less restrict the definition to mean a release of Mr. Tang alone. Instead, after itemizing the four listed conditions, the demand merely stated:

> The purpose of this letter is to give you, on behalf of your insured, an opportunity within the next thirty (30) days to legally effectuate a permanent, binding and enforceable settlement contract and at an amount of money that does not require any payment by you[r] insured of monies above and beyond your in-

sured's total available liability insurance policy limits. (Id.).

The Eleventh Circuit's decision in Kivi v. Nationwide Mut. Ins. Co. is particularly instructive. Kivi concerned an insurer's failure to accept a policy limits demand following a catastrophic car accident. As relevant here, the plaintiff's policy limits settlement demand offered to release Nationwide's insured, who was the owner of the car, but did not include a specific release of the driver of the car, who was covered by the policy under an "omnibus" clause for persons driving the vehicle with the owner's permission (the "omnibus insured"). Id. at 1286. Nationwide argued that the settlement demand was unreasonable on several grounds, including the failure to provide an explicit release of the omnibus insured. Kivi, 695 F.2d at 1287. The Eleventh Circuit summarily rejected this argument:

> Nationwide next asserts that because the [claimants'] offer did not provide for the release of the omnibus insured ... there was no valid offer of a reasonable settlement opportunity triggering an excess damage claim. [¶] We do not view [the claimants'] letter offer so narrowly, because it is not alone dispositive of the bad faith issue.... [¶]
>
> Nor are we persuaded that the offer for settlement was deficient because it did not specifically provide for the disposition of the omnibus insureds' claim, or for the release of subrogation rights and the hospital lien. It is significant that Nationwide never mentioned these items to the [claimants] as an impediment to a settlement. ....

Id. at 1287–88 (emphasis added) (citing Government Employees Ins. Co. v. Grounds, 311 So.2d 164 (Fla. App. 1975)).

Plaintiffs presented evidence that the settlement condition requiring Allstate to submit an "appropriate release" would be understood in the industry to allow for the release of all relevant insureds, and that it was incumbent on Allstate to identify those insureds in the release. (JMOL Opp. at 2–3, 12). According to Plaintiffs' expert, "appropriate release" simply means "appropriate for this case," which could include Mrs. Tang. (Walker, Tr. 11/19/15 AM at 54:5–6, 21–23). The Parties offered conflicting expert testimony on this issue. (See, e.g., Walker, Tr. 11/19/15 AM at 53:20–54:34, 61:3–12 & 76:22–77:13; Cannon, Tr. 11/20/15 PM at 135:16–22, 137:2–20 & 139:8–140:19). While Allstate may believe that its evidence was more persuasive, a court may not make credibility determinations or weigh the evidence on a Rule 50(b) motion. Krechman, 723 F.3d at 1110 (citation omitted). A jury could reasonably find, based on the evidence, that the demand contemplated the release of other, unknown insureds besides Mr. Tang.

The cases cited by Allstate for the proposition that a reasonable settlement offer must include all insureds are easily distinguishable. Here, Allstate not only failed to disclose the identity and insured status of Mrs. Tang, but also affirmatively represented on numerous occasions that its "insured" was Mr. Tang. Because Allstate's cases involved different factual scenarios than the one presented here, they do not preclude a finding that Madrigal's request for an "appropriate release" encompassed all insureds.

For example, in Graciano, the claimant identified the wrong policy holder and the wrong policy number in her settlement demand, and refused to grant an extension once the only proper insured was identified by the insurer. Because the only demand ever extended was directed to a person who was not involved in the accident and whose policy had expired by the time of the accident, the Graciano court

concluded that the insurer was not liable for bad faith because there was "no substantial evidence [the claimant] ever offered to settle her claim against [the relevant insured] for an amount within [the relevant insured's] policy." Graciano, 231 Cal.App.4th at 427, 179 Cal.Rptr.3d 717; (see also JMOL Motion at 7–8) (citing Graciano). Thus, in Graciano, the settlement demand was a nullity as it was not directed to any relevant insured on any current policy.

In Strauss v. Farmers Ins. Exchange, 26 Cal.App.4th 1017, 31 Cal.Rptr.2d 811 (1994), the three insureds consisted of the driver who caused the accident, the company for which the driver was working at the time of the accident, and the owner of the company. Id. at 1019, 31 Cal.Rptr.2d 811. Claimant offered to settle against the driver alone for the $100,000 policy limit, but insisted on a payment of $950,000—well in excess of the policy limit—to settle against all three insureds. Id. at 1020, 31 Cal. Rptr.2d 811. In addition, claimant specifically rejected the insurer's policy limit counteroffer that required the release of all three insureds. Id. Therefore, in Strauss, the claimant, with full knowledge of the three insureds' identities, would not release all known insureds for the policy limit. (See JMOL Motion at 7–8) (citing Strauss).

Similarly, in Lehto v. Allstate Ins. Co., 31 Cal.App.4th 60, 36 Cal.Rptr.2d 814 (1994), a teenage driver and his mother were insured under the same policy. Id. at 64, 36 Cal.Rptr.2d 814. Because the teenage driver had been involved in numerous moving violations before the accident at issue, Allstate was concerned that the mother might be liable on a negligent entrustment theory. Id. Accordingly, during the months preceding claimant's settlement offer, Allstate "repeatedly told [claimant's counsel] that [it] would not pay the limits without a release of [both the driver and his mother]." Id. at 65, 36 Cal. Rptr.2d 814. Despite being repeatedly and expressly informed of the existence of both insureds, claimant offered to release only the mother for the $25,000 policy limit, but not the teenage driver. Id.; (see also JMOL Motion at 7–8) (citing Lehto). Accordingly, in Lehto, the insurer (Allstate) identified all relevant insureds by name before the settlement offer was made, and the claimant deliberately extended a policy limits offer that released only one of the known insureds.

Allstate relies on Shade Foods, Inc. v. Innovative Products Sales & Marketing, 78 Cal.App.4th 847, 93 Cal.Rptr.2d 364 (2000), but it is also factually distinct. (See JMOL Motion at 8). Shade Foods ("Shade") was a wholesale food manufacturer that made food ingredients for larger food product companies. Shade Foods, 78 Cal.App.4th at 861, 93 Cal.Rptr.2d 364. Shade purchased almonds from a supplier called IPS to make nut clusters for General Mills. Id. Shade was insured by Royal Insurance Company of America ("Royal"). IPS was insured by Northbrook National Insurance Company ("Northbrook"). IPS's policy with Northbrook "contained a vendor's endorsement that named Shade as an additional insured." Id. at 862, 93 Cal.Rptr.2d 364. When almonds purchased from IPS were found to contain wood splinters that ended up in nut clusters that Shade sold to General Mills, Shade sued IPS (the almond supplier), Royal (Shade's liability insurer) and Northbrook (IPS's liability insurer, on a policy with a "vendor's endorsement" naming Shade as a third party beneficiary). (Id. at 862–63, 93 Cal.Rptr.2d 364).

As relevant to this case, Shade made a settlement offer to insurers Royal and Northbrook for a combined amount of $2 million. Shade agreed not to seek losses over that amount or any "ex-contract

claims against its insurers." Id. at 885, 93 Cal.Rptr.2d 364. The offer as presented did not explicitly include a release of any parties. Northbrook tentatively agreed to the settlement, but insisted on four additional conditions, which included a release from General Mills; a release from Shade for Northbrook's primary insured, IPS; and a "release from Shade running in favor of Northbrook with respect to any first party claims," presumably on Shade's policy with Royal. Id. at 885–86, 93 Cal. Rptr.2d 364. The California Court of Appeal concluded that Northbrook's conditional acceptance of the settlement offer contingent on a release from the injured party, General Mills, was reasonable, as was Northbrook's insistence that the offer include a release for its primary insured (and Shade's co-insured under the policy), IPS. Id. at 887, 93 Cal.Rptr.2d 364 (citing Strauss). However, the court also found that Northbrook's conditioning the settlement on Shade's waiver of first party

claims was unreasonable, and upheld the jury's finding that Northbrook had breached the implied covenant of good faith and fair dealing on that ground. Id. at 888, 93 Cal.Rptr.2d 364. Shade Foods is inapposite because the settlement offer in that case did not, as presented, include any offer of release, and all relevant insureds were known to Shade.[17] Shade Foods does not address how a settlement demand must be drafted to encompass all insureds when some insureds are unknown to the party extending the offer.[18]

At the hearing, Allstate argued that Wallace v. Allstate Ins. Co., 1999 WL 51822 (N.D. Cal. Jan. 29, 1999), supports the contentions that a reasonable settlement demand has to include "a release of all insured" and that an insurer is under no duty to consider an injured party's undisclosed intentions regarding settlement. (Dkt. No. 300 at 51). However, in Wallace, both insureds were known to the claimant, who was a passenger in a car driven by

17. Similarly, in Grayson v. Allstate Ins. Co., 2014 WL 1813319 (C.D. Cal. May 7, 2014), aff'd 650 Fed.Appx. 320 (9th Cir. 2016) (unpublished), the court granted Allstate's motion for summary judgment on the ground that the claimant's settlement offer "did not include a release." 2014 WL 1813319 at *7 (citing Shade Foods, 78 Cal.App.4th at 887, 93 Cal.Rptr.2d 364). However, Grayson, like Shade Foods, is inapposite because the settlement offer did not offer to release any insured, even though the only insured was known to claimant. Id. Furthermore, the Grayson court determined that Allstate did not unreasonably refuse to settle, but in fact accepted claimant's demand, albeit initially with the inclusion of a standard release that conflicted with some of the terms of claimant's offer. Id. at *10. In addition, the same day that Allstate received a letter from claimant's counsel outlining the reasons why the standard release was unacceptable, "Allstate drafted a new release document, tailored specifically to resolve [claimant's] concerns." Id. Here, Allstate followed its January 29, 2010 policy limits offer with a clear rejection of Madrigal's demand by reducing the settle-

ment amount to $34,398. (Varela, Tr. 11/17/15 AM at 34:22–24 & 36:7–12).

18. Shade Foods, although cited by Allstate, arguably supports two propositions that conflict with arguments made in Allstate's JMOL Motion. First, the case illustrates that an insurer's insistence on the addition of reasonable amendments to a settlement offer (i.e., the inclusion of a release of its insured) need not be construed as a rejection of the offer. Second, Shade Foods also shows that an insurer can incur liability for bad faith by rejecting an otherwise "imperfect" offer (that, as presented, lacked any release) and insisting on the addition of an unreasonable condition to the offer of settlement. The Shade Foods court did not find that because the settlement offer on its face did not include an offer to release IPS, it was by definition unreasonable and could not be accepted. Instead, Shade Foods lends authority to the proposition that, depending on the factual context, at least some negotiation concerning the precise terms and scope of a settlement offer is an accepted practice in the insurance industry.

one of the insureds, a minor. The settlement demand explicitly offered to settle claimant's claims against the driver's mother, who was also an insured, but not the driver. Id. at *2 & n.3. Accordingly, Wallace does not address the present circumstances, in which the claimant was only aware of one insured and the insurance company failed to disclose the existence of a second insured.

Boicourt v. Amex Assurance Co., 78 Cal. App.4th 1390, 93 Cal.Rptr.2d 763 (2000), also cited by Allstate at the hearings and in its Reply, is similarly inapposite. (Dkt. No. 300 at 90). The Boicourt court held that an insurer's failure to disclose to its insured that an injured party has made a request for information about the insured's policy limits can constitute bad faith, even in the absence of an offer of settlement, to the extent that it deprives the insured of a "genuine opportunity to settle an excess claim within policy limits . . . ." Id. at 1399, 93 Cal.Rptr.2d 763. Allstate asserts that Boicourt requires an injured party to make certain inquiries to the insurer before proceeding with a bad faith claim. However, even if Boicourt can be construed to require an injured party to request information about an insured's policy limits, such a rule would not necessarily require a claimant to ask about the existence of specific unknown insureds before tendering a settlement offer. While it is obvious that every insured has a policy limit, not every insured has a co-insured. Particularly in this case, where Allstate affirmatively represented multiple times that Mr. Tang was its "insured," Boicourt's requirement that an insurer must inform its insured of a request for policy limits information does

not render Madrigal's settlement offer unreasonable.

Similarly, Allstate's reliance on Coe v. State Farm Mut. Auto. Ins. Co. is unavailing. (See Dkt. No. 300 at 90). The Coe court found that where worker's compensation insurance has paid benefits to an injured party, a claimant's settlement demand that fails to include the State Compensation Insurance Fund's express consent is unreasonable as a matter of law because "[t]he compensation-carrier consent prerequisite of a valid settlement is imposed by law." 66 Cal.App.3d at 993, 136 Cal.Rptr. 331. As the Coe court noted, without the Fund's express consent to the settlement, the insured could be "exposed to a recoupment action by the fund." Id. at 994, 136 Cal.Rptr. 331. Accordingly, acceptance of the settlement demand as presented would have breached the insurer's covenant of good faith and fair dealing "not to 'injure' [the insured's] rights under the policy." Id. Because Madrigal's case did not involve worker's compensation insurance or California law requiring the inclusion of a compensation carrier in the settlement, Coe is inapposite.

Finally, the remainder of Allstate's "failure to release" arguments fail to persuade the Court that Allstate is entitled to judgment of matter of law. As noted earlier, Allstate does not dispute that all of its correspondence with Madison prior to the January 15, 2010 demand identified only one insured—Mr. Tang. At the same time, Allstate argues that it "had no duty to disclose Mrs. Tang's existence or potential liability; to the contrary, it was legally prohibited from doing so." (JMOL Motion at 9) (emphasis in original).[19] A jury could

---

19. In support of its contention that it was legally prohibited from disclosing Mrs. Tang's name to Madison without Mrs. Tang's consent, Allstate notes that California Insurance Code section 791.13 prohibits insurers from

disclosing "personal information" about a policyholder without the policyholder's written consent, and that section 791.02(s) provides that "[p]ersonal information includes an individual's name." (JMOL Motion at 10)

find, in light of Allstate's repeated affirmative representations as to the identity of its insured and Allstate's belief that it could not disclose the identity of other insureds on the policy, that the settlement demand was reasonably directed to "Mr. Tang," with a more general condition requiring Allstate to submit an "appropriate release" that could encompass additional insureds. Indeed, to hold a plaintiff to a stricter standard would enable an insurer to withhold the existence of a relevant insured and then use the existence of that undisclosed insured to shield the insurer from liability by branding the settlement demand as unreasonable for failure to release all insureds.

Nor does the Court find it dispositive that even after learning that Allstate required a release of Anna Tang, Madison "neither made a new demand nor agreed to modify his existing demand to include Mrs. Tang." (See JMOL Motion at 17).

January 29, 2010, the day Varela sent a settlement letter to Madison with a release for both Mr. and Mrs. Tang, was a Friday. On February 4, 2010, three business days later, Varela revoked Allstate's January 29, 2010 offer and replaced it with an offer to settle for $34,398, which unequivocally was a rejection of Madrigal's January 15, 2010 policy limits demand. It is true that Madison may have had time in the three working days between Friday, January 29, 2010 and Thursday, February 4, 2010 to draft and submit a modified settlement demand that specifically included Mrs. Tang. However, construing the evidence in the light most favorable to Madrigal, a jury could find that Varela's January 29, 2010 policy limits offer, which enclosed a separate release form for Richard and Anna Tang, would not have signaled to Madison that he needed to revise his January 15, 2010 offer, but could reasonably be seen simply as the fulfillment of the condi-

(quoting Cal. Ins. Code §§ 791.02(s) & 791.13 and citing Griffi[th] v. State Farm Mut. Auto. Ins. Co., 230 Cal.App.3d 59, 65–67, 281 Cal. Rptr. 165 (1991) (Insurance Information and Privacy Protection Act prohibits unauthorized disclosure of insured's name, inter alia); Boicourt, 78 Cal.App.4th at 1392 & n.1, 93 Cal.Rptr.2d 763 (citing Griffith); Hon. W. Croskey, et al. California Practice Guide: Insurance Litigation § 4:42.4a (Rutter Group 2015) ("Absent appropriate authorization from the insured, insurance carriers are statutorily barred from disclosing 'policy limits' and other coverage information to third party claimants before a lawsuit is filed.") (emphasis in original)).

Allstate, however, was not barred from asking the Tangs for permission to reveal Anna Tang's name to Madrigal. Allstate argues, without citation to the record, that "[t]he evidence at trial established that Allstate did not obtain that consent [to release Mrs. Tang's name or status as an insured] until after Allstate received Madrigal's demand letter." (JMOL Motion at 10 n.3). This argument overlooks critical facts. Allstate failed to provide any evidence showing that Allstate asked Mrs. Tang for permission to disclose her name and

status. As the Boicourt decision noted, bad faith may lie where an insurer "refus[ed] to give the insured the option of disclosing" personal information by failing to ask the insured for permission to make such a disclosure when the failure to disclose "may have foreclosed a possible settlement of the underlying claim within those limits." Boicourt, 78 Cal. App.4th at 1392, 93 Cal.Rptr.2d 763 ("[T]he insurer's sin here was a blanket refusal to contact the insured to see if he wanted the policy limits disclosed.").

While Allstate may have had strategic reasons for withholding Mrs. Tang's identity from Madison, it simply cannot use its decision not to ask Mrs. Tang for permission to reveal her name as a sword against Madrigal for failing to specifically include Mrs. Tang in the demand. The Court further notes that after receiving the demand, Varela estimates that she had at least "five or six conversations" with the Tangs about the asset sheet condition. (Varela, Tr. 11/16/15 at 222:4–8). Accordingly, the record demonstrates that Varela was able to address disclosure issues with the Tangs and could have asked Mrs. Tang for permission to inform Madison about her identity at any time.

tion that Allstate submit an "appropriate release." In such a case, a modified offer would not be required. Furthermore, even if Madison had felt that the inclusion of Mrs. Tang was a new term that would warrant an explicit modification of the settlement demand, a three-day delay in responding to Varela's January 29, 2010 letter does not appear to be excessive. The jury could reasonably have concluded that Allstate cut off the possibility of settlement by dropping Allstate's offer to $34,398 on February 4, 2010.

Allstate has failed to show that the only reasonable conclusion permitted by the evidence is that Madrigal's settlement demand was defective because it did not expressly release Anna Tang. Accordingly, Allstate's Motion for Judgment as a Matter of Law under Rule 50(b) is DENIED to the extent that it is based on the contention that Madrigal's demand was unreasonable because it lacked an express release of Anna Tang.

### 2. Richard Tang's Failure To Provide An Asset Sheet

■ Alternatively, Allstate argues that its failure to accept Madrigal's settlement demand was reasonable as a matter of law because Mr. Tang did not and would not provide an asset sheet as required by the demand. However, whether Mr. Tang (or Mrs. Tang) was willing to provide an asset sheet, and thus, whether Allstate could have complied with the settlement demand's requirement, was a strongly disputed factual issue at trial. Allstate has not shown that the only reasonable conclusion permitted by the evidence is that Allstate could not accept the demand for reasons beyond its control.

■ California law is clear that "ordinarily[,] '[w]hether the insurer has acted unreasonably, and hence in bad faith, in rejecting a settlement offer is a question of fact to be determined by the jury.' ... The question becomes one of law only when, because there are no conflicting inferences, reasonable minds could not differ." Walbrook Ins. Co., 5 Cal.App.4th at 1454, 7 Cal.Rptr.2d 513 (internal citation omitted); see also Brehm v. 21st Century Ins. Co., 166 Cal.App.4th 1225, 83 Cal.Rptr.3d 410 (2008) (reasonableness of insurer's "settlement counteroffer at the time it was made is simply not a question that can be resolved at the pleading stage" because whether an insurer has acted unreasonably " 'is a question of fact to be determined by the jury' ") (quoting Shade Foods, 78 Cal. App.4th at 888, 93 Cal.Rptr.2d 364).

Whether Allstate could have submitted an asset sheet for Mr. Tang turns in large part on the competing testimony of Varela and Mrs. Tang. Witness credibility is a question of fact for the jury. Vorse v. Sarasy, 53 Cal.App.4th 998, 1001, 62 Cal. Rptr.2d 164 (1997). Furthermore, "the testimony of one witness entitled to credit is sufficient to establish a fact in a civil case." Vollaro v. Lispi, 224 Cal.App.4th 93, 102, 168 Cal.Rptr.3d 323 (2014) (internal quotation marks and citation omitted); see also Cal. Evid. Code § 411 ("Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact.").

Varela testified that she addressed the asset sheet requirement with the Tangs on several occasions and repeatedly advised them of their right to consult an attorney. According to Varela, although the Tangs said that they were considering consulting an attorney, and asked her to send a copy of the January 15, 2010 letter to Dobbin Lo, Mrs. Tang ultimately told Varela that they did not want to provide an asset sheet and would not do so. However, during the trial Mrs. Tang categorically denied that she and her husband ever refused or even

expressed reluctance to disclose their assets. (Tang, Tr. 11/20/15 PM at 48:9–19 & 51:10–13).[20] According to Mrs. Tang, there was no objection to providing asset information because she and her husband did not have significant assets.[21] Moreover, Mrs. Tang stated that Allstate never provided a form for them to do so or explained what the consequences of failing to provide an asset sheet would be. (Tang, Tr. 11/20/16 PM at 53:4–7 & 53:21–23). Allstate had the opportunity to cross-examine Mrs. Tang at length on these matters. Based on Mrs. Tang's testimony, and Mr. Tang's language difficulties, a reasonable jury could conclude that the Tangs were not at fault for the lack of an asset sheet to provide to Madrigal.

The cases on which Allstate relies to support its argument that an insurer may not provide "legal advice" is largely inapposite. (JMOL Motion at 22). Allstate's argument appears to presume that any discussion with the Tangs beyond the existence of an asset sheet condition constitutes the practice of law. This position is not required by California law, and is inconsistent with an insurer's obligation to "attempt[ ] in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Cal. Ins. Code § 790.03(g)(5); see also Graciano, 231 Cal. App.4th at 425, 179 Cal.Rptr.3d 717 (the implied covenant "obligates the insurance company ... to make reasonable efforts to settle a third party's lawsuit against the insured").

For example, in Gibson v. Government Employees Ins. Co., 162 Cal.App.3d 441, 208 Cal.Rptr. 511 (1984), cited by Allstate, the court simply found that an insurer's fiduciary duties "are limited to those arising out of the insurance contract" and do not require the insurer to advise its insureds about "the availability of coverage in addition to that requested," either from the insurer itself or a competitor, or "the inadequacy of [the insureds'] policy limits." Id. at 443, 208 Cal.Rptr. 511. Noting that by turning insurers into their insureds' "personal financial guardians," "the rule advocated by plaintiffs herein would subject insurance carriers to liability for failing to advise their own insureds of an arguably better package of insurance offered by a competitor," which the court found "goes well beyond anything required by law or dictated by common sense." Id. at 451–52, 208 Cal.Rptr. 511. Gibson does not address an insurer's obligations in the context of a settlement offer.

Similarly, Woodruff v. McDonald's Restaurants, 75 Cal.App.3d 655, 142 Cal.Rptr. 367 (1977), held that because "an insurance company is not entitled to practice law," an

---

**20.** Mrs. Tang testified on direct:

Q [Varela] said to the jury that on January 15, 2010, you refused to give your asset information. Is that true?
A No. That's not true.
Q Did she talk to you about on the January 15, 2010, phone call that there's an issue with you having to give an asset sheet?
A No. That's not true.
Q She told the jury there were five to six times that she spoke to you where you refused to give your asset information. Is that true?
A No, that's not true.
(Tang, Tr. 11/20/15 PM at 48:9–19).

Mrs. Tang further testified:

Q Did you ever tell her I refuse to give an asset sheet?
A No.
Q Did you tell her you wish not to give an asset sheet?
A No.
(Id. at 51:10–13).

**21.** For example, Mrs. Tang stated that she was not concerned about contacting an attorney regarding the asset disclosure requirement because "[her] house [was] upside down and [her] business doing no good ...." (Id. at 51:6–7).

insurance company may not appear on behalf of a corporation in superior court. Id. at 658, 142 Cal.Rptr. 367 (citing Cal. Bus. & Prof. Code § 6125) ("No person shall practice law in California unless the person is an active member of the State Bar."). Woodruff does not address the kinds of discussions with an insured that potentially constitute the practice of law. In Wilkinson v. Rives, 116 Cal.App.3d 641, 172 Cal.Rptr. 254 (1981), the court held that "[w] hen a title insurer furnishes a preliminary title report to a prospective buyer, the insurer serves as an abstractor of title and has a duty to list all matters of public record regarding the subject property in its preliminary report," but has "no duty to give a legal opinion ... concerning title to the subject property, and in fact [is] prohibited from doing so." Id. at 650, 172 Cal.Rptr. 254.[22] These cases do not address an insurer's obligations to its insured in the context of a settlement offer.

A jury could reasonably find, based on the Tangs' lack of facility with the English language and apparent unfamiliarity with the settlement process, that Allstate's duty to attempt to effectuate a fair settlement required something more than simply telling the Tangs that Madrigal wanted an asset sheet and that they may wish to consult an attorney. For example, in Kinder v. Western Pioneer Ins. Co., 231 Cal. App.2d 894, 42 Cal.Rptr. 394 (1965), the insured was a janitor whom the insurer's claims manager and counsel described as a man of "below average" or "low" intelligence. Kinder, 231 Cal.App.2d at 898, 42 Cal.Rptr. 394. The California Court of Appeal, after recognizing that "[w]hat is good faith is essentially a question of fact," emphasized that in communicating with the insured about settlement prospects, "it was particularly important for the insurer to explain the matter thoroughly to the insured because of his limited ability to comprehend." (Id. at 901, 42 Cal.Rptr. 394). Furthermore, as the California Supreme Court has more recently recognized,

> [T]o have any meaning, ... the implied duty to reasonably and in good faith settle third party claims within policy limits in an appropriate case, must extend to insureds that are less than perfect litigants. An insured's known weaknesses as a litigant should inform the insurer's assessment of the likelihood of an excess judgment, not diminish the insurer's obligation to reasonably accept settlement offers within policy limits.

Kransco v. American Empire Surplus Lines Ins. Co., 23 Cal.4th 390, 410, 97 Cal.Rptr.2d 151, 2 P.3d 1 (2000) (citing Kinder, 231 Cal.App.2d at 898, 42 Cal. Rptr. 394, for proposition that insured's "low intelligence provided additional reasons to settle the case").

As a leading treatise explains,

> As a minimum, the insurer is obligated to inform the insured concerning settlement proposals within the policy limits.

**22.** Allstate also cites Jones v. Allstate Ins. Co., 146 Wash.2d 291, 45 P.3d 1068 (Wash. 2002), for the general proposition that an "insurer cannot provide legal services to [an] insured." (JMOL Motion at 22). However, Jones not only addressed whether an insurer can provide legal advice to unrepresented third party claimants, not insureds, but also found that under Washington law (not applicable here), an insurer can do so, provided that it complies with the appropriate standard of care. See Jones, 146 Wash.2d at 305 & 312, 45 P.3d 1068 ("to safeguard the public interest, we hold that insurance claims adjusters, when preparing and completing documents which affect the legal rights of third party claimants and when advising third parties to sign such documents, must comply with the standard of care of a practicing attorney" by informing claimants "that there may be legal consequences in signing the release and check" and disclosing the insurer's potential conflict of interest).

The insurer may also be duty-bound to disclose to the insured counteroffers it has made and any other significant developments in the settlement negotiations. It is particularly important for the insurer to explain thoroughly the significance of settlement negotiations to the insured when his ability to comprehend such matters is limited.

21 Am. Jur. Trials 229 (May 2016 update) (footnotes and case citations omitted; emphasis added). Although Allstate repeatedly asserted at the May 6, 2016 hearing that requiring something more from an insurer than an obligation to inform an insured of her right to consult an attorney is "unprecedented under any context in the State of California," (Dkt. No. 304 at 8:14), Allstate overstates what the Court has found. As noted by the Kransco and Kinder decisions, as well as the treatise mentioned above, an insurer's duties include a duty to consider the limitations of the insured when communicating about a proposed settlement.

Here, it was undisputed that Mr. Tang did not speak English, was illiterate in any language, and did not have even an elementary school education. Based on the evidence presented, the jury could have determined that Allstate did not discharge its duty simply by telling the Tangs that the settlement offer included an asset sheet condition and that they may wish to consult with an attorney.

However, even accepting Varela's contention that the Tangs told her on January 28, 2010 that they "might" consult with an attorney about the asset sheet, and irrespective of any duty Allstate may have had to communicate more effectively with the Tangs, a jury could reasonably find that Allstate was responsible for the failure to obtain an asset sheet because it sent a letter the very next day, January 29, 2010, to Madrigal proposing a settlement that did not include the provision of an asset sheet.

Allstate has not shown that the evidence permits only one reasonable conclusion as to the reasonableness of Allstate's conduct involving the asset sheet condition. Accordingly, Allstate's Motion for Judgment as a Matter of Law under Rule 50(b) is DENIED to the extent that it is based on the contention that Allstate's failure to accept Madrigal's settlement demand was reasonable as a matter of law.

In sum, Allstate has not met its burden of showing that the "evidence permits only one reasonable conclusion" in its favor on Plaintiffs' bad faith claims. Wallace, 479 F.3d at 624. Accordingly, Allstate's Motion for Judgment as a Matter of Law is DENIED.

## V.

## ALLSTATE'S MOTION FOR A NEW TRIAL

### A. The Parties' Contentions

Allstate argues that it is entitled to a new trial on Plaintiffs' bad faith claims for four independent reasons. (New Tr. Motion at 1, 7–24). First, Allstate contends that the Court failed to properly instruct the jury regarding the elements of a reasonable settlement offer. (Id. at 1–2, 7–10; New Tr. Reply at 3–5). Specifically, Allstate argues that it was entitled to its requested instruction that a settlement demand is not reasonable unless it provides for a complete release of "all insureds." (New Tr. Motion at 7). According to Allstate, the Court's final instruction that a demand must merely include "a proper release under the circumstances," (Dkt. No. 207), is unsupported by case law, and was improperly similar to the "appropriate release" language used in Madrigal's de-

mand letter, to Allstate's prejudice. (Id. at 9–10).

Second, Allstate contends that the special verdict form deprived it of a jury decision on whether Allstate was the proximate cause of Plaintiffs' injury, which was a "significant liability defense." (Id. at 2, 11–15; New Tr. Reply at 5–9). According to Allstate, it presented substantial evidence at trial that the Tangs and/or Madrigal and his attorney were responsible for the failure to achieve a settlement. (New Tr. Motion at 11–12). Allstate maintains that the failure to include a separate proximate cause question on the special verdict form deprived it of its right to a jury finding on every disputed element of liability, and was not cured simply because the Court instructed the jury on proximate cause. (Id. at 13–15).

Third, Allstate contends that the Court failed to properly instruct the jury on the definition and effect of an acceptance of a settlement demand. (Id. at 2–3, 16–19; New Tr. Reply at 10). According to Allstate, it was critical to its defense that Varela's January 29, 2010 letter be construed as a counteroffer as opposed to an attempt to accept Madrigal's demand. If, as Allstate contends, the January 29, 2010 letter could properly be construed only as a counteroffer, and thus a rejection of Madrigal's demand, its subsequent $34,398 offer was "simply a revised offer" and, as such, did not need to be reasonable because an insurer's liability for bad faith depends on the insurer's rejection of a reasonable settlement demand, not the reasonableness of the insurer's offer or counteroffer.[23] (New Tr. Motion at 17). Furthermore, Allstate argues that Madrigal's demand, which set forth the conditions that Allstate had to meet to "accept" the demand and the consequences of fail-

ing to meet all of those conditions, could not substitute for an instruction from the Court on the general law of acceptance. (Id. at 19).

Fourth, Allstate contends that there was insufficient evidence to support the jury's findings that (1) Madrigal's demand was a reasonable settlement offer, and (2) Allstate unreasonably refused to tender its policy limits. (New Tr. Motion at 3, 19–24; New Tr. Reply at 11–12). According to Allstate, the evidence clearly established that if Allstate had accepted the demand, it would not have resulted in a legally enforceable agreement to release Mrs. Tang. (New Tr. Motion at 20). Furthermore, according to Allstate, the clear weight of the evidence established that Allstate could not have complied with the asset sheet condition. (Id. at 21–22). Finally, Allstate maintains that the clear weight of the evidence established that its February 19, 2010 policy limits offer was timely. (Id. at 23–24).

Plaintiffs argue that Graciano does not "hold that an insurance carrier can reject a policy limits offer to a known insured [whose] offer agrees to an 'appropriate release of all claims' because the offer does not identify another potentially culpable insured that the carrier has never identified and that the claimant is unaware of." (New Tr. Opp. at 12). Furthermore, Plaintiffs contend that because Allstate was permitted to, and did, argue that the offer was unreasonable because it did not include Mrs. Tang, Allstate cannot show prejudice. (Id. at 14). With respect to the omission of a proximate cause question on the special verdict form, Plaintiffs argue that because Allstate rejected the January 15, 2010 settlement demand and then attempted to tender policy limits only after

---

**23.** Nonetheless, Allstate argued throughout this case that its January 29, 2010 letter was a counteroffer that constituted a "reasonable rejection" of Madrigal's demand.

the deadline for accepting the January 15 settlement demand had expired, proximate cause was not an issue. (Id. at 15–19). Plaintiffs argue that the Court correctly denied Allstate's request for a separate instruction on the legal meaning of an "acceptance" because the Court instructed the jury that a "counteroffer has the legal effect of rejecting the offer" and that "[o]nce an offer is rejected or countered, it is deemed withdrawn and no longer available for acceptance." (Id. at 20) (citing Dkt. No. 157 at 43–44). Finally, Plaintiffs argue that the jury's verdict was not against the clear weight of the evidence. (New Tr. Opp. at 22–25).

## B. Standard For A New Trial Under Rule 59

 Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Unlike a motion for judgment as a matter of law, on a motion for a new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." Landes Const. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987). A district court's grant of a new trial is reviewed for an abuse of discretion. Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 818 (9th Cir. 2001).

In Landes, the court noted:

On one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.

Landes, 833 F.2d at 1371 (internal citations omitted).

 Rule 59 " 'does not specify the grounds on which a motion for a new trial may be granted,' but allows new trials to be granted for historically recognized grounds." Shimko v. Guenther, 505 F.3d 987, 993 (9th Cir. 2007) (quoting Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007)). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.' " Molski, 481 F.3d at 729 (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940)); see also Shimko, 505 F.3d at 993 ("The trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." (citation and internal quotation marks omitted)). "A new trial may be ordered to correct manifest errors of law or fact, but the burden of showing harmful error rests on the party seeking the new trial." Boston Scientific Corp. v. Johnson & Johnson, 550 F.Supp.2d 1102, 1110 (N.D. Cal. 2008) (internal quotations and citations omitted).

 If the moving party's motion alleges the jury's verdict is against the clear weight of the evidence, a new trial should be granted where, "having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has

been committed[.]" Landes Constr. Co., 833 F.2d at 1371–72. However, the court "may not grant a new trial simply because it would have arrived at a different verdict." Silver Sage Partners, 251 F.3d at 819.

■ Pursuant to Rule 61, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61 (emphasis added). Accordingly, an erroneous evidentiary ruling can warrant a new trial, but only if it " 'substantially prejudiced' a party." Ruvalcaba v. City of Los Angeles, 64 F.3d 1323, 1328 (9th Cir. 1995); Harper v. City of Los Angeles, 533 F.3d 1010, 1030 (9th Cir. 2008).

■ An erroneous jury instruction may similarly warrant a new trial, unless the error was harmless. Sanders v. City of Newport, 657 F.3d 772, 781 (9th Cir. 2011) (" 'An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless.' ") (quoting Dang v. Cross, 422 F.3d 800, 811 (9th Cir. 2005)); accord Swinton v. Potomac Corp., 270 F.3d 794, 805 (9th Cir. 2001). Prejudice is generally "more likely than not if 'nothing about th[e jury's] verdict indicates that the result would have been the same without the error.' " Sanders, 657 F.3d at 781 (quoting Clem v. Lomeli, 566 F.3d 1177, 1182 (9th Cir. 2009)).

## C. Allstate Is Not Entitled To A New Trial On Plaintiffs' Bad Faith Claims

■ A district court has discretion to order a new trial to prevent a miscarriage of justice, Shimko, 505 F.3d at 993, such as when the court is "left with the definite and firm conviction that a mistake has been made" in the jury's verdict, Landes Constr. Co., 833 F.2d at 1371–72, or when an instructional error "substantially prejudiced" the moving party. Ruvalcaba, 64 F.3d at 1328. Allstate has failed to meet its burden of showing harmful error sufficient to warrant a new trial.

### 1. Failure To Instruct The Jury That A Reasonable Settlement Demand Must Include A "Complete Release Of All Insureds"

■ Allstate contends that it is entitled to a new trial so that the jury may be specifically instructed that a settlement demand is not reasonable unless it provides for a "complete release of all insureds." Noting that the Court's tentative Order re Disputed Jury Instructions, in reliance on Graciano, 231 Cal.App.4th at 425, 179 Cal. Rptr.3d 717, included that requirement, Allstate argues that the Court improperly deleted the "complete release of all insureds" language from its final instruction and erroneously replaced it with language that a reasonable demand must include "a proper release under the circumstances." (New Tr. Motion at 8).

The Court notes as a preliminary matter that although it modified Allstate's proposed instruction on the components of a reasonable settlement demand, it nonetheless agreed to give the modified instruction on this issue over Plaintiffs' objections. (See generally Order dated November 20, 2015, Dkt. No. 207). Furthermore, the Court adopted Allstate's proposed instructions on a number of key substantive issues, such as the implied obligation of good faith and fair dealing (Dkt. No. 205, Order dated November 19, 2015, at 20–21); refusal to accept reasonable settlement within liability policy limits—essential factual elements (id. at 21–22); damages on multiple legal theories

(id. at 22–23); causation (id. at 28–29); and conduct of the insured. (Id. at 29–30). Accordingly, Allstate's dispute is focused on a single, isolated component of the Court's instructions, which otherwise followed Allstate's proposed instructions.

At trial, the Court instructed the jury that to find Allstate liable for bad faith, the jury had to find that Allstate "failed to accept a reasonable settlement demand for an amount within policy limits." (Dkt. No. 226 at 27). The Court further instructed:

> For a settlement demand to be "reasonable," Plaintiffs must establish that: (1) the terms of Carlos Madrigal's demand were clear enough to have created an enforceable contract resolving all claims had it been accepted by Allstate, (2) the demand included a proper release under the circumstances, (3) the time provided for acceptance did not deprive Allstate of an adequate opportunity to investigate and evaluate its insured's exposure, and (4) Allstate knew or should have known at the time the settlement demand was rejected that the potential judgment was likely to exceed the amount of the settlement demand based on Carlos Madrigal's injuries or loss and Mr. Tang's probable liability. Additionally, Carlos Madrigal's demand had to be capable of being accepted by Allstate.

(Id.) (emphasis added).

In its Order re Disputed Jury Instructions, the Court explained its decision to modify the language in the Graciano decision concerning a "complete release of all insureds" as follows:

> The Court has modified the language from Graciano to be consistent with the evidentiary issues in this case. In particular, Plaintiffs contend that their offer was proper because it sought an "appropriate release," and that under the circumstance that they were unaware of Anna Tang, a release for Richard Tang

was proper. Defendant contends that it could not accept Madrigal's offer of January 15, 2010, because the offer did not specifically identify a release for Anna Tang. The meaning and implications of the January 15, 2010 letter, under all the circumstances of this case, is a disputed issue for the jury decide. Accordingly, the Court has modified the jury instruction to reflect the factual issues present here.

(Dkt. No. 207 at 5).

 The Ninth Circuit instructs that "'jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading.'" Gantt v. City of Los Angeles, 717 F.3d 702, 706 (9th Cir. 2013) (quoting Dang, 422 F.3d at 804) (alteration, quotation marks, citation omitted)). "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence.'" Dang, 422 F.3d at 804–05 (quoting Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002); see also Mendez v. County of San Bernardino, 540 F.3d 1109, 1117–18 (9th Cir. 2008) ("[T] here must be a sufficient evidentiary foundation to support giving [an] instruction."). However, "[a] court is not required to use the exact words proposed by a party, incorporate every proposition of law suggested by counsel or amplify an instruction if the instruction as given allowed the jury to determine intelligently the issues presented." Los Angeles Memorial Coliseum Comm'n. v. National Football League, 726 F.2d 1381, 1398 (9th Cir. 1984); see also Taylor v. Burlington Northern R. Co., 787 F.2d 1309, 1314 (9th Cir. 1986) ("The district judge has discretion in formulating jury instructions and is not required to use the exact words proposed by either party. The judge does not abuse his discretion so long as, viewed as a whole, the instructions

adequately describe the parties' theories of the case."). In sum, "[a] party is not entitled to a jury instruction phrased exactly as it desires; rather, an instruction is proper if it adequately allows the party to argue its theory of the case to the jury." Fiorito Bros., Inc. v. Fruehauf Corp., 747 F.2d 1309, 1316 (9th Cir. 1984).

 Instructional errors that are harmless do not require reversal. Dang, 422 F.3d at 805. In a diversity case, a federal court will " 'look to state law for the correct substance of jury instructions, [but] the question whether an incorrect instruction is prejudicially erroneous is a procedural one requiring application of federal law.' " Miller v. Republic Nat. Life Ins. Co., 789 F.2d 1336, 1338–39 (9th Cir. 1986) (quoting Pollock v. Koehring Co., 540 F.2d 425, 426 (9th Cir. 1976)); see also In re Hawaii Fed. Asbestos Cases, 960 F.2d 806, 814 (9th Cir. 1992) ("In diversity actions, since state law is applied, it controls the substantive content of jury instructions. Federal law, however, governs the determination of whether an incorrect instruction results in prejudicial error."). An instruction is prejudicially erroneous if "looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." Swinton, 270 F.3d at 802 (alteration in original; internal quotation marks and citations omitted) (court should not "look[ ] at any one jury instruction in isolation" when analyzing adequacy of charge).

 However, even an erroneous instruction is harmless if "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." Clem, 566 F.3d at 1182 (internal quotation marks and citation omitted); see also Galdamez v. Potter, 415 F.3d 1015, 1025 (9th Cir. 2005) (in a civil case, instructional error is harmless if it is "more probable than not that the jury

would have reached the same verdict"). In making that determination, courts look beyond the instructions to the proceedings as a whole. For example, in Sanders v. City of Newport, 657 F.3d 772 (9th Cir. 2011), the Ninth Circuit determined that the trial court's instruction improperly shifted the burden from the employer to the employee to show that the employer did not have a legitimate reason to refuse to reinstate plaintiff after she was returning from leave under the Family Medical Leave Act. Id. at 782. Defendant argued that even if there was an error in the jury instruction, the error was harmless because defendant had proved that plaintiff could not perform the "essential functions" of her job. The Ninth Circuit determined that to determine whether the instructional error was harmless, "we consider the court's jury instruction, the question posed on the verdict form, and the evidence presented to the jury, to determine if the jury found that Sanders could not perform the essential functions of her position." Id.

Similarly, in Nationwide Transport Finance v. Cass Information Systems, Inc., 523 F.3d 1051 (9th Cir. 2008), the Ninth Circuit determined that the trial court's instructions erroneously failed to inform the jury about certain elements of a "contractual interference tort." Id. at 1064. The court concluded that the omission was harmless, however, because plaintiff introduced "little or no evidence establishing a necessary element of [plaintiff's] interference claims," thereby making it "more probable than not that the jury would have reached the same result" even if the district court had used plaintiff's proposed formation. Id. at 1065; see also Northwestern Mut. Life Ins. Co. v. Koch, 424 Fed.Appx. 621, 624 (9th Cir. 2011) (omission of jury instruction harmless error where jury's inquiry would have been "substantially the same" with or without

the instruction); Smith v. Chesapeake & Ohio Ry. Co., 778 F.2d 384, 387–88 (7th Cir. 1985) ("[W]hen assessing the adequacy of jury instructions given at trial, we consider not only the instructions as a whole, but [also] ... the opening statements, the evidence and the closing argument to determine if the jury was adequately informed of the applicable law.") (internal quotation marks and citation omitted); Bronk v. Ineichen, 54 F.3d 425, 431 (7th Cir. 1995) (citing Smith for the proposition that a "court can examine [the] rest of trial in assessing [the] impact of instructions").

Allstate does not contend that the Court's use of the phrase "proper release under the circumstances" as one of the components of a reasonable settlement offer was somehow in conflict with its theory of the case, or that the phrasing of the instruction prevented Allstate from presenting evidence that the release in this case was improper because it allegedly did not include all insureds. Rather, the gravamen of Allstate's argument is that the Court's instruction was not specific enough. As Allstate's counsel argued at the November 20, 2015 hearing on certain proposed jury instructions, "if the Court wants to leave the term 'proper release under the circumstances,' it needs to say 'proper release under the circumstances that would have released all potentially liable insureds." (Klee, Tr. 11/20/15 AM at 13:24–14:2).[24] In sum, Allstate contends that the omission of an explicit directive that a reasonable offer must include "all potentially liable insureds" rendered the Court's broader instruction that the release must include a "proper release under the circumstances" inadequate.

 The Court disagrees that its instruction on the components of a reasonable settlement offer was inadequate or misleading. The instruction was consistent with the law and the evidence in the present case. "[T]here must be a sufficient evidentiary foundation to support giving [an] instruction." Yan Fang Du v. Allstate Ins. Co., 697 F.3d 753, 757 (9th Cir. 2012). A court should tailor its instructions to conform to the evidence but not to favor either side. Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1246 (10th Cir. 2002) ("Rather than merely restating counsel's argument, jury instructions should be a neutral statement of the law.").[25] The Court modified the instruction in order to provide the jury with a neutral statement of the law.

The Graciano case upon which Allstate relies involved the unique circumstance where the only demand ever extended was directed to a person who was not involved in the accident and whose policy had expired by the time of the accident, and not to the sole relevant insured, the driver who caused the traffic accident, who was known to the claimant. Graciano, 231 Cal.App.4th at 427, 179 Cal.Rptr.3d 717. Strauss, the case cited by the Graciano court for the proposition that a reasonable release must include "all insureds," involved a situation in which the claimant offered to settle with only one of three known insureds. Strauss, 26 Cal.App.4th at 1020, 31 Cal.Rptr.2d 811. Neither case specifically addressed the sit-

---

**24.** Allstate was represented at trial by counsel Peter H. Klee and Theona Zhordania.

**25.** A leading practice guide advises: "Jury instructions should provide the relevant rules of law generally and avoid singling out or stressing particular evidentiary items or legal theories; otherwise, the court's emphasis of certain facts or issues may cause a juror to attach undue importance or credibility to the selected matters." Rutter Group Prac. Guide Fed. Civ. Trials & Ev. Ch. 15-B § 15:80 (2015) (citing cases).

uation presented by this case, where only one of two potentially liable insureds was known to the claimant.

Evidence at trial provided conflicting interpretations of what the phrase "appropriate release" in Madrigal's settlement might mean. The Court concluded that including the phrase "release of all insureds" in "reasonable settlement offer" instruction, language taken from cases in which "all insureds" were known to the claimants, would be problematic. The Court concluded that the jury could improperly conclude that a reasonable settlement demand must include a specific offer to release each insured by name, whether known or unknown. Accordingly, the Court tailored the instruction to the facts of this particular case, as the instruction permitted the jury to consider whether the term "appropriate release" in Madrigal's demand would be understood in the industry to encompass "all insureds," even if Mrs. Tang was not specifically named in the settlement demand. This was a hotly contested issue throughout the trial. The Court's instruction adequately allowed Allstate "to argue its theory of the case to the jury" without unduly prejudicing either party. Fiorito Bros., 747 F.2d at 1316.

 Furthermore, even if the phrase "proper release under the circumstances" in lieu of "all insureds" was an error, which the Court does not find, the error was harmless. " 'Harmless error review for a civil jury trial ... shifts [the burden] to the [prevailing party] to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed.' " Wilkerson v. Wheeler, 772 F.3d 834, 838 (9th Cir. 2014) (quoting Gantt v. City of L.A., 717 F.3d 702, 707 (9th Cir. 2013) (some brackets in original)). As previously explained, in conducting a harmless error review, the court will look to the proceedings as a whole, including other trial instructions, the evidence presented at trial, and the arguments of counsel, to determine if it is more probable than not that the jury would have reached the same verdict had it been properly instructed. See Sanders, 657 F.3d at 782; Gantt, 717 F.3d at 707; Smith, 778 F.2d at 387–88.

Even though the Court's other instructions did not explicitly state that a "reasonable demand" must result in a release of all potentially liable insureds, there is simply no possibility that the jury could be confused about that issue. Expert witnesses for both Madrigal and Allstate agreed that Allstate could not accept Madrigal's demand unless it encompassed a release for both of the Tangs. Plaintiffs' expert, Timothy Walker, conceded that an insurance company cannot exhaust its policy limits on one insured if that would lead to another potentially liable insured being left without any insurance, "[u]nless the insureds had been advised of it and had agreed ...." (Walker, Tr. 11/19/15 AM at 87:5–11). Walker testified that it would make "sense" for Anna Tang to be included in any settlement. (Id. at 87:5–15). Walker further stated that "it was appropriate for Allstate to identify the issue of the release" of Mrs. Tang. (Id. at 88:23–24).

Anthony Cannon, Allstate's expert, concurred, stating that Madrigal's demand "had a number of conditions that were appropriate that Allstate could deal with to accept the demand, but it could not accept the demand to exhaust the policy limit unless it was going to release all insureds, in this case Mr. and Mrs. Tang." (Cannon, Tr. 11/20/15 PM at 136:17–21). Cannon further testified,

Q Why did Allstate—based on industry custom and practice, why did Allstate need to include Mrs. Tang in any settlement?

A The custom and practice of any insurance company requires that the policy benefits do not be exhausted for one insured at the expense of another in every case, because to do so—for example, in this case there was evidence suggesting potentially Mrs. Tang would have statutory liability as the owner of the car or vicarious liability if Mr. Tang was in the course and scope of his employment.

To exhaust that hundred-thousand-dollar entire policy would leave Mrs. Tang without the benefit of a defense and money to pay for any claims against her. So, for example, when she was later sued in the action, Allstate paid her defense and paid the defense of the folks who were insured without the policy lapse, but you would leave an insured exposed in derogation of their rights by covering the other insured.

Q So what could have happened to Allstate if it had simply settled out Mr. Tang?

A Mrs. Tang could have sued Allstate if she had damages for defending herself for being sued.

(Id. 138:11–139:7). Both experts provided testimony to the jury that in order to

settle, Allstate would require a release of all insureds.

The Parties' closing arguments also focused on whether Madrigal's settlement demand encompassed Mrs. Tang. Plaintiffs' counsel never argued that Madrigal's settlement demand would have been reasonable without a release of Mrs. Tang. Rather, he argued that Madrigal's "appropriate release" condition encompassed Mrs. Tang. (See Homampour, Tr. 11/23/15 PM at 26:5–8) ("Appropriate release. The letter says give me an appropriate release. Allstate can send back the release they sent that has Anna Tang on it. That's an appropriate release. Check."); id. at 24:2–6 ("And so, if there's a problem that his offer doesn't identify Anna Tang, then they write back and say, look, we need Anna Tang released. And Mr. Madison told you we would have released Anna Tang because she had no liability.").[26]

The Parties presented conflicting evidence about whether Madrigal's demand would have resulted in a release of Mrs. Tang, but they agreed, explicitly and repeatedly, that under California law, a reasonable settlement demand must result in a release of all insureds. Viewing the proceedings as a whole, there was no risk that the jury did not understand that particular rule.[27] Therefore, even if the Court had

---

**26.** Plaintiffs were represented at trial by Arash Homampour and Warren Jay Binder.

**27.** At the hearing on May 6, 2016, Allstate's counsel argued that without an instruction explicitly defining a "reasonable settlement demand" as one that results in the release of all insureds, the jury could have concluded that the release at issue was "appropriate" because it offered to release Mr. Tang, who was the only person against whom the $10 million judgment in the underlying state court proceedings was entered. According to Allstate,

> [U]nless [the jury was] rejecting the testimony of both experts, they would have had to come to the conclusion that this—this

release can be appropriate without offering to release all insureds. Especially because the claimants were arguing that Mrs. Tang was not a necessary party and she didn't really have much liability in it. You know, that's really not—she wasn't really somebody that really mattered. And, so, they could have come—they could have followed that argument and come to the conclusion that, you know what, she wasn't really the liable party here. In fact, she got dismissed before trial. [¶] So, really, the person who got hit with the excess judgment was Mr. Tang. So, that's the only person that we need to worry about.

(Klee, Dkt. No. 304 at 28:14–29:2 (transcript of May 6, 2016 hearing)). This argument over-

adopted Allstate's proposed language and instructed the jury that a "proper release under the circumstances" is one "that would have released all potentially liable insureds," it is more probable than not that the jury's verdict would have been the same. (Klee, Tr. 11/20/15 AM at 13:24–14:2).

The Court concludes that its instruction did not result in a miscarriage of justice and did not prejudice the jury's verdict. Accordingly, Allstate's Motion for New Trial is DENIED to the extent that it is based on the failure to include Allstate's proposed language concerning "all potential insureds" in the Court's instruction.

### 2. Failure To Include A Question On Proximate Cause On The Special Verdict Form

Allstate contends that it is entitled to a new trial because the Court declined to include a question on proximate cause on the special verdict form. Allstate's proposed question number four addressed its proximate cause defense as follows: "Was Allstate's refusal to accept Madrigal's settlement demand the proximate cause of the excess judgment being entered against Mr. Tang?" (Dkt. No. 175 at 2). Allstate argues that even though the Court instructed the jury on proximate cause, (see Dkt. No. 226 at 30), the Court's decision not to include a proximate cause question on the special verdict form improperly prevented "the jury from considering and deciding the existence or non-existence of this essential element of liability." (New Tr. Motion at 15).

The Ninth Circuit has explained,

The district court has broad discretion in deciding whether to send the case to the jury for a special or general verdict. Fed. R. Civ. Proc. 49(a). This discretion extends to determining the content and layout of the verdict form, and any interrogatories submitted to the jury, provided the questions asked are reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment. United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655, 51 F.3d 1402, 1408 (9th Cir. 1995); see also McCord v. Maguire, 885 F.2d 650, 650 (9th Cir. 1989) ("Federal Rule of Civil Procedure 49(a) gives district courts wide discretion in the use of special verdicts; refusal of a special verdict form is therefore reviewed only for gross abuse."); Floyd v. Laws, 929 F.2d 1390, 1395 (9th Cir. 1991) (formulation of questions on a special verdict form is reviewed for abuse of discretion).

In a challenge to a verdict form, a court is to consider "whether the questions in the form were adequate to obtain a jury determination of the factual issues essential to judgment." Smith v. Jackson, 84 F.3d 1213, 1220 (9th Cir. 1996). While the court's discretion regarding content of special verdict forms is broad, the Ninth Circuit has explained that, as a general matter, "a new trial should be granted when a district court erroneously submits to a jury an issue that should have been decided as a matter of law and the basis of the jury's general verdict is unknown." Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1050 (9th Cir. 1998); see also Lattimore v. Polaroid Corp., 99 F.3d 456, 468 (1st Cir. 1996)

---

looks the fact that both Plaintiff's expert and Plaintiff's counsel agreed with Allstate that the release had to encompass Mrs. Tang. Even if the scenario envisioned by Allstate's counsel were possible, it does not support the

proposition that it is more probable than not that the jury would have reached the same result even if it had been instructed as Allstate requested. Clem, 566 F.3d at 1182; Galdamez, 415 F.3d at 1025.

("Although we know of no authority directly on point, we hold that ... [a] new trial ordinarily is required when a special verdict finding encompasses multiple facts and claims some of which should not have been submitted to the jury."). The <u>Kendall–Jackson</u> court concluded that even though the special verdict form in that case did not separately address each element of a trade dress claim, such that the exact basis of the jury's verdict was unknown, a new trial was not warranted. The court found that the omission of special verdict questions addressing each element separately did not render the verdict untrustworthy because the challenged claim elements involved questions of fact that were properly presented to the jury, and sufficient evidence supported the verdict. <u>Kendall–Jackson,</u> 150 F.3d at 1050–51.

■ Here, the Court included a jury instruction on causation as follows:

> To prove their claim that Allstate breached the implied covenant of good faith and fair dealing by failing to accept a settlement offer within the policy limits, Plaintiffs must show that Allstate's conduct was the proximate cause of the judgment entered against Richard Tang.

(Dkt. No. 226 at 30). However, the Court declined to include Allstate's proposed "proximate cause" question on the special verdict form on the following grounds: ·

> Neither the current version of nor the proposed revisions to CACI 2334 include "proximate cause" as an explicit and distinct element of a third party bad faith claim. (See PVF, Exhs. 1–2). Accordingly, the Court declines to adopt Question 4. However, the Court's decision is without prejudice to Allstate's right to argue the issue to the jury.

(Dkt. No. 205 at 8). Over Plaintiffs' objection (Dkt. 205, pp. 28–9), the Court instructed the jury with Allstate's proposed instruction on causation. A jury is presumed to follow its instructions. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). In addition, Allstate forcefully argued the causation issue in its closing argument. The jury had all the tools necessary to reach causation and there is no reason to believe that the ultimate verdict does not reflect consideration of the element of causation. <u>See Reed v. City of Modesto</u>, 2016 WL 1073242, at *5 (E.D. Cal. Mar. 18, 2016), <u>appeal docketed</u>, No. 16–15694 (9th Cir. Apr. 15, 2016) (failure to include proposed verdict form question on causation did not warrant new trial where the jury was properly instructed on causation and its absence did not "render the verdict flawed").

Allstate argues that "the fact that a model jury instruction does not contain all elements of a claim is not dispositive" of the issue of whether the special verdict form in this case improperly omitted a "proximate cause" question. (New Tr. Motion at 12). However, the omission of proximate cause as a separate and distinct element of a bad faith claim from the model jury instruction certainly does not <u>compel</u> the inclusion of a specific question about "proximate cause" on the special verdict form, particularly when, as here, Allstate does not claim that the Court's jury instruction on causation was inadequate. The questions on the verdict form did not require the jury to consider facts and claims that should not have been presented to it, which the <u>Lattimore</u> court found to be one of the relatively rare instances when the content of a special verdict form would exceed a trial court's exercise of discretion and warrant a new trial. <u>Lattimore</u>, 99 F.3d at 468. The special verdict questions that were presented to the jury concerning the reasonableness of Madrigal's offer and the unreasonableness of Allstate's failure to accept the offer were broad enough to adequately "obtain a jury determination of

the factual issues <u>essential</u> to judgment." <u>Smith</u>, 84 F.3d at 1220; <u>see also</u> <u>Gardner v. Federal Express Corp.</u>, 2016 WL 1560080, at *4 (N.D. Cal. April 18, 2016) (failure to include causation question on verdict form did not warrant new trial where questions asked and answered on the form disposed of essential issues presented to jury and could be construed consistently).

Allstate begins its argument regarding proximate cause by citing to <u>Hamilton v. Maryland Cas. Co.</u>, 27 Cal.4th 718, 117 Cal.Rptr.2d 318, 41 P.3d 128 (2002), for the general proposition that " 'an insurer that breaches its duty of reasonable settlement is liable for all the insured's damages proximately caused by the breach.' " (New Tr. Motion at 11) (quoting <u>Hamilton</u>, 27 Cal.4th at 725, 117 Cal.Rptr.2d 318, 41 P.3d 128) (emphasis omitted). Beyond this recitation of a rule, however, <u>Hamilton</u> does not offer guidance on the particular issue before the Court, which is not whether proximate cause is an element of a bad faith claim, but whether a jury's verdict is fatally defective where the special verdict form did not include a separate "causation" question.

<u>Peckham v. Continental Casualty Ins. Co.</u>, 895 F.2d 830 (1st Cir. 1990), is more relevant here. (New Tr. Motion at 13). In <u>Peckham</u>, the First Circuit examined whether a jury's findings that the insurance company had acted in bad faith, but that the bad faith did not cause the excess judgment against the insured, could be reasonably reconciled. The jury verdict form, included as an appendix in the published decision, specifically asked the "proximate cause" question, unlike the verdict form in the present case.

The <u>Peckham</u> court determined that the jury could have plausibly found that the insurance company's earlier bad faith refusal to settle the injured party's claim was later cured by a "curative offer" to settle, an offer which claimant's counsel never disclosed to the claimant. <u>Id.</u> at 838. Thus, "intervening events" that were not reasonably foreseeable could have led the jury to find that the insurance company's earlier bad faith denial of a settlement offer did not "cause" the excess judgment. The <u>Peckham</u> court concluded that "there was no warrant to withhold the issue of proximate cause from the jury—particularly since the plaintiffs had the burden of proving it." <u>Id.</u> at 839 (internal citations omitted).

<u>Peckham</u> and the remaining cases cited by Allstate do not compel a new trial here. First, the issue of proximate cause was submitted to the jury—albeit as a jury instruction, not a separate question on the verdict form. <u>Peckham</u> does not hold that a separate question on the verdict form is mandatory, only that the jury may consider proximate cause. There is no reason to believe that the jury did not consider proximate cause, as it received an instruction on causation and Allstate argued causation. Second, <u>Peckham</u> and all the remaining cases cited by Allstate fail to rely on California law. <u>Peckham</u> followed Massachusetts law. This Court is obligated to follow the law of California in resolving substantive issues before it.

The only case cited by Allstate that includes California law is <u>Blankenbaker v. Progressive Casualty Insurance Co.</u>, 620 Fed.Appx. 579 (9th Cir. 2015), and it, too, fails to change the result here. In <u>Blankenbaker</u>, the insurance company initially rejected a settlement offer because it did not include a release by all of the individuals injured in a car accident of their claims against the insured. <u>Id.</u> at 580 n.2. Despite the rejection, negotiations "continued for several additional days, with no indication ... [that the] settlement offer was withdrawn." <u>Id.</u> at 580. However, it was undis-

puted that the insured was aware of the injured parties' policy limits offer, but directed her insurance company not to settle because she did not think that she was at fault for the accident and was not worried about an excess judgment because she had no assets and believed that the injured parties would not be interested in suing her. Id. Accordingly, "[b]ecause the record unequivocally demonstrate[d] [that the insured] was aware of the settlement offer during the relevant time period and was not remotely interested in settling the case," the Ninth Circuit found that the district court reasonably determined that the insurance company's initial rejection of the settlement offer was not the cause of the excess judgment and that summary judgment on causation grounds was appropriate. Id.

There are compelling reasons why Blankenbaker does not control the present case. Blankenbaker was a summary judgment decision, and does not resolve how a reviewing court should evaluate a jury's verdict that incorporated the question of causation into its ultimate decision, resolving disputed issues of fact along the way. See Reed, 2016 WL 1073242, at *5. Furthermore, under the unique circumstances at issue in Blankenbaker, the injured parties' attorney appeared to leave the offer open after the insurer's initial rejection. Therefore, a timely acceptance of the policy limits offer would have been possible if the insured had been willing to consider settlement, which she adamantly was not. Here, Madrigal did not leave the policy limits offer open after Allstate's rejection, as was his right under California law, and even if the offer had been left open to the end of the acceptance period set forth in Madrigal's demand, the only offers made by Allstate to cure its rejection were untimely.

Moreover, the Court notes that the dissent in Blankenbaker rejected the majority's decision on the grounds that the majority decision was contrary to California law and also conflicted with an earlier Ninth Circuit case, Anguiano v. Allstate, 209 F.3d 1167, 1169–70 (9th Cir. 2000). The Blankenbaker dissent observed that under California law, the rejection of the first settlement offer terminates that offer, and later attempts to accept an expired settlement offer do not cure the earlier bad faith rejection. This Court reiterates that it is bound to apply California law. Nothing in Blankenbaker leads the Court to conclude that the omission of a proximate cause question on the special verdict form resulted in the jury's failure to consider causation, an element on which the jury was instructed by the Court and which Allstate vigorously argued at trial.

The Court concludes that its decision to omit a proximate cause question from the special verdict form did not result in a miscarriage of justice and did not prejudice the jury's verdict. Accordingly, Allstate's Motion for New Trial is DENIED to the extent that it is based on the Court's failure to include Allstate's proposed proximate cause question on the special verdict form.

### 3. Failure To Instruct On The Definition Of "Acceptance"

Allstate contends that it is entitled to a new trial because the Court failed to properly instruct the jury on the definition and legal effect of an acceptance of a settlement demand. Allstate's proposed Jury Instruction No. 35 provided, in relevant part, that to constitute an acceptance, the terms "proposed in an offer must be met exactly, precisely and unequivocally"; the "addition of any condition or limitation is a rejection of the original offer and constitutes a counteroffer"; a purported "accep-

tance based upon terms that are different from those offered is a rejection of the offer"; where the party making the offer "specifies the method of acceptance, the offer may not be accepted by any other means"; and "a mere promise to perform the conditions" constitutes a counteroffer and rejection of the offer where exact performance is required. (Dkt. No. 159 at 120).

The Court instructed the jury that "A counteroffer has the legal effect of rejecting the offer to which the counteroffer is being made," (Dkt. No. 226 at 41), and that "Once an offer is rejected or countered, it is deemed withdrawn and no longer available for acceptance." (Id. at 42). However, the Court rejected Allstate's proposed instruction on the meaning of "acceptance" on the following grounds:

> Madrigal's January 15, 2010 settlement demand set forth the terms of the demand and the consequences of failing to adhere to the strict requirements of each term. Therefore, a general instruction on the law of acceptance is not necessary for the jury's deliberations. Furthermore, it is not apparent that all of the "rules" of acceptance itemized in the Disputed Instruction are applicable to the facts of this case. Accordingly, the Court DENIES the request to adopt Disputed Instruction No. 35.

(Dkt. No. 205 at 24–25).

■ A court is not required to instruct the jury on matters irrelevant to the resolution of the dispute. The portions of the proposed instruction that might be conceivably relevant would be redundant in light of the Court's instructions on counteroffers and rejections. The jury had ample evidence to decide whether Allstate's January 29, 2010 letter complied with the terms of the January 15, 2010 demand and did not require further instruction on the definition of "acceptance" to guide its de-

termination. Allstate has not shown that the inclusion of its proposed instruction would have resulted in a different outcome at trial. The Court concludes that its decision to omit an instruction on the elements of an "acceptance" did not result in a miscarriage of justice and did not prejudice the jury's verdict. Accordingly, Allstate's Motion for New Trial is DENIED to the extent that it is based on the Court's failure to instruct the jury on the definition of an acceptance.

### 4. Insufficiency Of The Evidence

Allstate contends that it is entitled to a new trial because the evidence was insufficient to support findings that (1) Madrigal's demand was a reasonable settlement offer, and (2) Allstate unreasonably refused to tender its policy limits. The evidence addressed in the Court's discussion of Allstate's Motion for Judgment as a Matter of Law also supports the conclusion that the jury's verdict was not contrary to the clear weight of the evidence. Whether or not the Court would have necessarily reached the same conclusion as the jury, the verdict does not leave the Court with a "definite and firm conviction that a mistake has been committed." Landes Constr. Co., 833 F.2d at 1371–72. Accordingly, Allstate's Motion for New Trial is DENIED to the extent that it is based on the alleged insufficiency of the evidence to support a finding of liability on Plaintiffs' bad faith claims.

In sum, Allstate has failed to show that any of the alleged errors had a sufficiently prejudicial effect on the outcome of the trial to warrant a new trial. Accordingly, Allstate's Motion for New Trial is DENIED.

### VI.

### CONCLUSION

For the reasons stated above, Allstate's Motion for Judgment as a Matter of Law

pursuant to Rule 50(b) on Plaintiffs' bad faith claims is DENIED. Allstate's Motion for a New Trial is similarly DENIED. The Court will include directions on filing a proposed judgment in the order addressing interest and costs.